2005 SD 43

**Charles DENOYER, Petitioner and Appellant,**

v.

**Douglas WEBER, Warden of South Dakota Penitentiary, Defendant and Appellee.**

**No. 23223.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 15, 2005.

Decided March 23, 2005.

Matthew T. Stephens, Rapid City, South Dakota, Attorney for petitioner and appellant.

Lawrence E. Long, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for defendant and appellee.

GILBERTSON, Chief Justice.

[¶ 1.] Petitioner, who was charged with first degree burglary and second degree rape, declined a plea bargain that would have allowed him to avoid a mandatory life sentence without parole and capped his potential sentence at a maximum of fifteen years. Petitioner was convicted after a jury trial, and lost his subsequent appeal. Petitioner filed a writ of habeas corpus contending that the cumulative errors of his trial counsel amounted to ineffective assistance of counsel. Petitioner alleged his trial counsel errors included refusing to let him testify at trial, failing to advise him of the legal consequences of rejecting the State's plea offer, failing to adequately advise him during consideration of the plea offer that testimony of key defense witnesses could or would be excluded at trial, failing to call the victim's husband as a witness and failing to request a continuance to locate another witness. The habeas court rejected Petitioner's claims and denied relief, but granted Petitioner's motion for a certificate of probable cause. On appeal to this Court, Petitioner claimed his counsel was ineffective when they advised Petitioner that he had a good chance of prevailing at trial, that three factual witnesses and one expert witness would be testifying on his behalf but ultimately did not, and that the habitual information filed against him was unconstitutional and that the prior convictions alleged were subject to challenge. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] On June 26, 1993, K.P. drove with her three-year-old son from her home in Rapid City to visit a friend in Black Hawk, South Dakota. After arriving at her friend's house at around 5:30 p.m., K.P. started drinking. At approximately midnight, K.P. left her son with her friend and drove to a bar where she continued drinking. Sometime around 1 a.m., K.P. asked a friend, Steve Brandsted, for a ride home. Brandsted drove K.P. to her friend's house where she picked up her three-year-old and then Brandsted drove her home.

[¶ 3.] After arriving at her home, K.P. wanted Brandsted to give her another ride in order to retrieve her car, as she was concerned her husband would be angry with her when he returned home and found the car was gone.[1] However, K.P. put her son to bed, laid down beside him, and fell asleep within ten minutes according to Brandsted. When Brandsted left, K.P. was wearing jeans and a t-shirt, sound asleep with her son, and audibly snoring.

[¶ 4.] In the early morning hours, K.P was awakened by a man on top of her having sexual intercourse. K.P. began pushing and hitting the man. K.P.'s son was rousted by the noise, and said "Momma, it's Charlie." K.P. continued striking the man and told him to get out. The man

---

1. K.P.'s husband, A.P., was incarcerated at the Pennington County Jail in a work release program. He regularly returned home around 6 a.m. and spent a few hours at home before going to work.

left the bedroom and K.P. dressed herself, gathered her son, and ran to a neighbor's house to call the police. An officer arrived on the scene between 5 a.m. and 6 a.m., and found K.P. upset, confused and in a state of shock. K.P. told the police she had been raped by Petitioner.

[¶ 5.] The police began searching for Petitioner, and found him walking approximately three miles from K.P's house. Petitioner had blood spatters on his shirt and scratch marks on his face. Petitioner was arrested and taken to county jail for an interview. At the interview, Petitioner was advised of some Miranda rights, but he was not informed of his continuing right to remain silent. Petitioner gave a statement to the interviewing detective that corroborated several key details of K.P.'s account of the incident, particularly that K.P. woke up with Petitioner on top of her.

[¶ 6.] Petitioner was charged with first degree burglary and second degree rape. Petitioner entered pleas of not-guilty at his arraignment. The State filed an Information, Part II, alleging Petitioner had four prior felony convictions and that the State intended to seek an enhanced penalty upon conviction. Petitioner was represented by two attorneys from the Pennington County Public Defender's office, Robin Zephier (Zephier) and Becky Janssen (Janssen).

[¶ 7.] Zephier and Janssen filed a motion to suppress Petitioner's custodial statement that corroborated K.P.'s account of the incident. The trial court originally suppressed the statement based on the ineffective waiver of Petitioner's Miranda rights. However, the trial court later ruled Petitioner's statement could be admissible for impeachment if Petitioner testified at trial. The trial court elected to delay ruling until trial, noting that the ruling would be predicated on the form of direct examination questions and the content of the testimony elicited.

[¶ 8.] Additional trial strategies employed by attorneys Zephier and Janssen included a challenge to the constitutionality of the habitual offender sentencing enhancement scheme in SDCL 22–7–8.1.[2] Petitioner's attorneys also advised him that there were holes in the State's case, and that trial strategy should focus on the issue of consent. Attorneys Zephier and Janssen planned on calling witnesses that would testify to the appearance of a boyfriend-girlfriend relationship between Petitioner and K.P. Petitioner's attorneys also planned to challenge the Part II habitual offender information, contending some previous convictions were obtained in violation of Petitioner's constitutional rights. Throughout trial strategy discussions with Petitioner, he firmly maintained his innocence and contended that K.P. had consented to the sexual intercourse.

[¶ 9.] On November 22, 1993, one week before the scheduled start of the trial, Deputy State's Attorney Mark Vargo telephoned attorney Zephier with a plea bargain offer. The offer required Petitioner to plead guilty to second degree burglary in exchange for the State dismissing the remaining counts and the habitual offender information. The effect of the plea bargain was to reduce a potential mandatory life sentence without parole, to a maximum of fifteen years imprisonment. The State was motivated to make the offer out of concerns about the strength of their case and the wishes of the victim, who did not want to relive the rape at trial. The next day on November 23, 1993, Attorney Ze-

---

2. The constitutionality of the sentencing enhancement scheme was arguable at the time of Petitioner's prosecution. However, we upheld the constitutionality of the scheme in State v. Stetter, 513 N.W.2d 87 (S.D.1994), which was handed down on December 20, 1994, a few weeks after Petitioner's conviction.

phier met with Petitioner and advised him of the plea agreement. Petitioner refused the plea bargain, maintained his innocence, and elected to go to trial.

[¶ 10.] At Petitioner's trial held on November 29–30, 1993, attorneys Zephier and Janssen put on two witnesses for the defense that helped to establish that Petitioner and K.P. had been good friends, and that Petitioner had been at K.P.'s house several times before the rape incident. Defense counsel was able to demonstrate during K.P.'s cross-examination the many times Petitioner had been at K.P.'s home, the closeness of her friendship with Petitioner, and her husband's habit of returning home in the early morning hours while on work release. Defense counsel also brought out K.P.'s minimization of her drinking on the night of the accident to the responding officer.[3] Counsel also established that A.P. hurt K.P. when he was angry over not knowing where she was at night. Finally the defense utilized a witness to establish the visible injuries sustained by K.P. during the incident to support the theory that K.P. was motivated by fear of her husband to report the incident as a rape.

[¶ 11.] Petitioner never testified on his own behalf during the trial. The trial judge asked Petitioner if it was his decision not to testify. Petitioner indicated it was his decision, and that defense counsel had explained both his right to testify and the risks of testifying on his own behalf. The jury found Petitioner guilty of first degree burglary and second degree rape. Petitioner was sentenced under the habitual offender enhancement scheme to a mandatory life term without possibility of parole.

[¶ 12.] Petitioner appealed the conviction in *State v. DeNoyer*, 541 N.W.2d 725 (S.D.1995). In that appeal, Petitioner contended (1) his prior convictions were not valid for enhancement purposes, (2) that his sentence had been improperly enhanced under SDCL 22–7–8.1, (3) the trial court erred when it excluded testimony of prior conduct of the victim under the rape shield law, (4) that his custodial statement was not voluntary and not admissible for impeachment purposes, and that the trial court also erred when it (5) denied the proposed jury instructions on the offenses of unlawful entry and refusal to leave and (6) when it denied Petitioner's motion for new trial. We affirmed the trial court on all six issues. *Id.* at 733.

[¶ 13.] On May 27, 2003, almost ten years after judgment of conviction was entered, Petitioner filed a writ of habeas corpus. Petitioner asserted a claim of ineffective assistance of counsel, alleging he was entitled to relief as (a) trial counsel refused to let him testify, (b) trial counsel failed to advise him of the legal consequences of rejecting the State's plea offer, (c) trial counsel failed to adequately advise him during consideration of the plea offer that testimony of key defense witnesses could or would be excluded at trial, (d) trial counsel failed to call the victim's husband, A.P., as a witness and failed to request a continuance to locate another witness, Eric Stensland, and (e) that the cumulative effect of these errors by counsel denied Petitioner effective assistance of counsel and a fair trial.

[¶ 14.] On November 5, 2003, the habeas court conducted an evidentiary hearing. Petitioner, trial counsel Robin Zephier and Becky Janssen, and prosecutor Mark Vargo testified. The habeas court rejected

---

**3.** K.P. originally reported she consumed only one alcoholic beverage the evening prior to the assault. However, at trial she testified she consumed one pint of spiced rum, and a part of another at her friend's home and at least a part of another beer at a bar.

Petitioner's claims and entered Findings of Fact and Conclusions of Law. Petitioner filed a motion for certificate of probable cause, which was granted by the habeas court in an order filed March 17, 2004. The habeas court certified that an appealable issue existed, but did not specify what that issue was.

[¶ 15.] Petitioner appealed the lower court's denial of his writ of habeas corpus contending one issue for review by this Court:

> Whether Petitioner was denied effective assistance of counsel when he was offered and rejected a plea agreement with a maximum fifteen year prison term, proceeded to trial, and subsequently received a life sentence, and where
>
> (a) Petitioner was advised that he had a good chance of prevailing at trial;
>
> (b) Petitioner was advised that three certain factual witnesses and one expert witness would be testifying on his behalf, which witnesses ultimately did not testify; and
>
> (c) Petitioner was advised that the habitual information filed against him was unconstitutional and that the prior convictions alleged were subject to challenge.

## STANDARD OF REVIEW

[¶ 16.] An appeal of a habeas decision is "a collateral attack on a final judgment," and as such is reviewed under a more restrictive standard than ordinary appeals. *Brakeall v. Weber*, 2003 SD 90, ¶ 6, 668 N.W.2d 79, 82 (citations omitted). Our review is limited to determining "(1) whether the court has jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether the incarcerated defendant has been deprived of basic constitutional rights." *Bradley v.*

*Weber*, 1999 SD 68, ¶ 12, 595 N.W.2d 615, 619 (citing *Flute v. Class*, 1997 SD 10, ¶ 8, 559 N.W.2d 554, 556) (additional citations omitted). Under habeas review of a criminal case, a trial court will be deprived of jurisdiction when a defendant's basic constitutional rights have been violated. *Id.*

[¶ 17.] The habeas petitioner bears the initial burden of showing by a preponderance of the evidence that he is entitled to relief. *Siers v. Class*, 1998 SD 77, ¶ 10, 581 N.W.2d 491, 494 (citing *Johnson v. Zerbst*, 304 U.S. 458, 469, 58 S.Ct. 1019, 1025, 82 L.Ed. 1461, 1469 (1938); *Loop v. Class*, 1996 SD 107, ¶ 14, 554 N.W.2d 189, 191; *Two Eagle v. Leapley*, 522 N.W.2d 765, 768 (S.D.1994)). We will not reverse the habeas court's findings absent clear error. *Bradley*, 1999 SD 68, ¶ 12, 595 N.W.2d at 619 (citations omitted). If the habeas court was "right for any reason," we may affirm its ruling. *Krebs v. Weber*, 2000 SD 40, ¶ 5, 608 N.W.2d 322, 324 (citing *New v. Weber*, 1999 SD 125, ¶ 5, 600 N.W.2d 568, 572) (citing *Satter v. Solem*, 458 N.W.2d 762, 768 (S.D.1990))).

[¶ 18.] Review of an ineffective assistance of counsel claim is a mixed question of law and fact. *Siers*, 1998 SD 77, ¶ 11, 581 N.W.2d at 494 (citing *Lykken v. Class*, 1997 SD 29, 561 N.W.2d 302). The petitioner must overcome the "strong presumption that counsel's performance falls within the wide range of professional assistance." *Bradley*, 1999 SD 68, ¶ 19, 595 N.W.2d at 621 (citing *Siers*, 1998 SD 77, ¶ 12, 581 N.W.2d at 495). Unless clear error is present we defer to the habeas court's findings of fact regarding counsel's performance, but we may substitute our own judgment "as to whether defense counsel's actions or inactions constituted ineffective assistance of counsel." *Lien v. Class*, 1998 SD 7, 12, 574 N.W.2d 601, 607 (citing *Lykken*, 1997 SD 29, ¶ 6, 561

N.W.2d at 304–05 (quoting *Aliberti v. Solem,* 428 N.W.2d 638, 640 (S.D.1988))). However, while we "will not compare counsel's performance to that of some idealized 'super-lawyer' and will respect the integrity of counsel's decision in choosing a particular strategy, these considerations must be balanced with the need to insure that counsel's performance was within the realm of competence required of members of the profession." *Sprik v. Class,* 1997 SD 134, ¶ 24, 572 N.W.2d 824, 829 (citing *Roden v. Solem,* 431 N.W.2d 665, 667 n. 1 (S.D.1988)). We will also examine the conduct of counsel and the options they faced from counsel's perspective prior to, and during trial. *Aliberti,* 428 N.W.2d at 641 (citing *Waff v. Solem,* 427 N.W.2d 118, 121 (S.D.1988) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305, 323 (1986)); *Luna v. Solem,* 411 N.W.2d 656, 658 (quoting *Kimmelman, supra* ). We will not engage in some sort of twenty-twenty hindsight or Monday morning quarterbacking. *Id.* (citing *Conaty v. Solem,* 422 N.W.2d 102, 103 (S.D.1988); *Woods v. Solem,* 405 N.W.2d 59, 62 (S.D.1987); *State v. Dornbusch,* 384 N.W.2d 682, 686–87 (S.D.1986)).

## ANALYSIS AND DECISION

[¶ 19.] We evaluate ineffective assistance of counsel claims under the two-prong test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Bradley,* 1999 SD 68, ¶ 18, 595 N.W.2d at 620 (citations omitted). Under the first prong, the petitioner must show trial counsel's errors were so serious that he was not functioning as counsel guaranteed by the Constitution. *Id.* (citing *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Hopfinger v. Leapley,* 511 N.W.2d 845 (S.D.1994)). The second prong requires a showing of serious prejudice such that the errors deprived the defendant of a fair trial, a trial whose result is reliable. *Id.* Prejudice exists only when there is a reasonable probability that, but for counsel's unprofessional errors, the proceeding would have been different. *Id.* (citing *Woods v. Solem,* 405 N.W.2d 59, 61 (S.D.1987)). As we have noted in the past:

> There is a strong presumption that counsel's performance falls within the wide range of professional assistance and the reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all circumstances. The petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Brakeall,* 2003 SD 90, ¶ 15, 668 N.W.2d at 84 (quoting *Bradley,* 1999 SD 68, ¶ 19, 595 N.W.2d at 621). Effective assistance of counsel does not equate with a successful outcome for the accused. *Randall v. Weber,* 2002 SD 149, ¶ 6, 655 N.W.2d 92, 96 (citing *Jenner v. Leapley,* 521 N.W.2d 422, 425 (S.D.1994); *State v. McBride,* 296 N.W.2d 551, 554 (S.D.1980)).

[¶ 20.] **Whether Petitioner was denied effective assistance of counsel when he was offered and rejected a plea agreement with a maximum fifteen-year prison term, proceeded to trial, and subsequently received a life sentence.**

[¶ 21.] We assess trial counsel's competency by determining "whether defense counsel exercised the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *Williams v. State,* 349 N.W.2d 58, 61 (S.D.1984) (citing *State v. Tchida,* 347 N.W.2d 338 (S.D.1984); *High Elk v. State,* 344 N.W.2d 497 (S.D.1984); *United States v. Easter,* 539 F.2d 663 (8th

Cir.1976)). Counsel's performance will be reasonable when it includes an "adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Lien*, 1998 SD 7, ¶ 17, 574 N.W.2d at 608 (quoting *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993)). The "[s]election of a defense is a trial strategy[,]" and as such this Court will seldom reevaluate trial counsel's choice. *Hofer v. Class*, 1998 SD 58, ¶ 15, 578 N.W.2d 583, 586 (quoting *Lodermeier v. Class*, 1996 SD 134, ¶ 12, 555 N.W.2d 618, 623 (citing *Fast Horse v. Leapley*, 521 N.W.2d 102, 106 (S.D.1994))).

[¶ 22.] **a) Petitioner was advised that he had a good chance of prevailing at trial.**

[¶ 23.] Petitioner claims he did not take the plea bargain offered by the State because Zephier and Janssen indicated that he had a good chance of prevailing at trial. At the habeas hearing, Petitioner testified attorneys Zephier and Janssen never told him he would not be convicted. However, Petitioner contends his attorneys told him the case was defensible and why, which led him to believe that he would be found innocent. Specifically, Petitioner testified that his trial counsel identified witnesses they intended to call to support the theory that K.P. had given consent, that the habitual sentencing enhancement scheme would not apply to him, and that if he did not testify he would preserve his right to appeal.

[¶ 24.] At the habeas hearing, Zephier testified from notes he made at the time of trial and from memory. Zephier testified that he believed Petitioner's case was clearly defensible at the time, and conveyed this information to Petitioner prior to trial. It was not until after the plea offer was made by the State that the trial court ruled much of the testimony concerning K.P.'s behavior the evening of the as-

sault was inadmissible. Up until that point, and even after the ruling, Zephier and Janssen believed there was enough evidence to call K.P.'s credibility into question, to challenge the lack of consent, and to show a motive for K.P. to fabricate the charge. Zephier also testified that he felt there was a legitimate opportunity to have the habitual offender information declared invalid, given the newness of the habitual offender sentencing scheme.

[¶ 25.] Zephier testified he had five years of experience with the public defender's office at the time of Petitioner's trial, and had defended between ten and fifteen rape cases at trial. Zephier also testified that although he did not recall the exact details of the conversation with Petitioner concerning the offered plea, he never had and never would tell a client that a not guilty verdict was certain.

[¶ 26.] The trial court found Zephier's version of the facts to be more credible as to Petitioner's claim that he was mislead into believing that he would not be convicted and not subject to the habitual offender sentencing enhancement. It is clear from the trial record and from the habeas hearing that Petitioner steadfastly maintained his innocence, and does to this day in his brief, and that he himself made the decision not to accept the guilty plea as he could not accept anything less than an offer to dismiss the charges.

[¶ 27.] We find nothing in the record to indicate deficient performance on the part of trial counsel with regard to the plea bargain offered by the State. Petitioner chose to interpret his attorney's qualifier "clearly defensible" as a guaranteed victory. Trial counsel did nothing unprofessional or deficient to create Petitioner's impression.

[¶ 28.] **b) Petitioner was advised that three certain factual witnesses and**

**one expert witness would be testifying on his behalf, which witnesses ultimately did not testify.**

[¶ 29.] The decision to call a specific witness is a trial strategy. *Hofer,* 1998 SD 58, ¶ 23, 578 N.W.2d at 587 (citing *Lodermeier,* 1996 SD 134, ¶ 20, 555 N.W.2d at 625). The failure to call a specific witness will not automatically rise to the level of ineffective assistance of counsel. *Id.* ¶ 15 (citing *Lodermeier,* 1996 SD 134, ¶ 20, 555 N.W.2d at 625 (citing *Garritsen v. Leapley,* 541 N.W.2d 89, 94 (S.D.1995))). Petitioner must show prejudice resulted that deprived him or her of a fair trial. *Rodriguez v. Weber,* 2000 SD 128, ¶ 38, 617 N.W.2d 132, 145 (citing *Sund v. Weber,* 1998 SD 123, ¶ 21, 588 N.W.2d 223, 226). In order to show prejudice, the Petitioner must show how the potential witnesses would have changed the outcome of the trial. *Id.* (citing *Fast Horse,* 1999 SD 97, ¶ 16, 598 N.W.2d at 544).

[¶ 30.] Petitioner argues trial counsel's failure to call Steve Brandsted to the witness stand to testify that K.P. had the ability to consent to sex when he left K.P.'s house, constituted ineffective assistance of counsel. In addition, Petitioner contends Brandsted would have been able to testify that K.P. was sexually aggressive on the night of the rape, and had offered Brandsted oral sex on the ride to her house. However, on the morning of the trial, the court ruled in favor of the State's motion to suppress all testimony about K.P.'s prior sexual history under South Dakota's rape shield laws.

[¶ 31.] Brandsted was called by the prosecution and testified that K.P. was very intoxicated on the evening in question, to the point of having trouble walking and talking. On cross-examination trial counsel elicited testimony from Brandsted that K.P. was afraid of her husband A.P., and that A.P. had previously beaten her for leaving her car at a bar. This testimony was used to support the defense theory that K.P. was motivated to lie about the encounter out of fear. Even if Brandsted would have testified that K.P. was capable of consent, such testimony would not have reconciled with his testimony as to her state of intoxication and would likely have bolstered the State's case.

[¶ 32.] Petitioner contends that the failure of his counsel to call Rodney Randall to testify concerning alleged lies told by K.P. on the witness stand was ineffective assistance of counsel. However, Randall did testify at trial, and related an incident in which he was out drinking with K.P. and Petitioner, and that K.P. tried to use a bogus story to get permission from a Friendship House supervisor for Petitioner to stay out later one night. Randall testified that he believed a romantic relationship existed between Petitioner and K.P. due to K.P.'s behavior when she grabbed Petitioner's leg and called him "Babe and Honey and stuff like that." Randall's testimony reconciled with defense counsel's defense strategy of showing a pre-existing relationship, the presence of consent, and K.P.'s lack of veracity.

[¶ 33.] Petitioner argues trial counsel was deficient and he was prejudiced as a result when counsel did not call A.P. as a witness. Petitioner maintains that A.P.'s testimony would have established K.P. lied on the witness stand. Defense counsel did not call A.P. after determining he was a hostile witness and would not have bolstered the defense's theories or Petitioner's case. Also, the marital privilege may have come into play.[4]

---

4. SDCL 19–13–12 provides: "A communication is confidential if it is made privately by any person to his or her spouse during their

[¶ 34.] Petitioner contends trial counsels' failure to call Eric Stensland as a defense witness also shows ineffective assistance of counsel. However, Stensland's testimony would have shown merely that Stensland dropped Petitioner off at K.P.'s house and Petitioner waived Stensland off.

[¶ 35.] Finally, Petitioner contends defense counsel failed to call expert witness Dr. Robert Looyenga, an expert in the area of the effects of alcohol consumption. Petitioner maintains that Dr. Looyenga would have testified as to the effect of alcohol on K.P. and whether she would have had the capacity to consent at the time of the rape based on her original assertion that she consumed only one beer the night of the assault. Such a theory is no better than speculative.

[¶ 36.] Defense counsel's tactical decisions about which witnesses would or would not be called reconcile with the defense strategy to show a pre-existing relationship between K.P. and Petitioner that would allow the jury to infer consent, and K.P.'s motivation to lie out of fear of her husband. Trial counsel developed a viable defense theory, investigated and interviewed witnesses and strategically selected those witnesses that bolstered the selected strategy. It cannot be said that counsel performed in a deficient manner by not calling specific witnesses whose testimony would not have supported the defense strategy, or that could have actually damaged the Petitioner in the eyes of the jury.

[¶ 37.] We agree with the habeas court that these facts did not constitute deficient performance on the part of Petitioner's trial counsel. What is evident from the habeas hearing is that Petitioner continued to proclaim his innocence and held fast to the notion that K.P. consented to the sexual encounter. However, none of the testimony he cites in his brief would have produced a different outcome on the issue of consent, as much of it was inadmissible due to the rape shield laws or did not pertain to the issue of K.P's consent. Petitioner may have believed such testimony would be allowed at trial, but Petitioner's mistaken belief as to the laws of this state cannot make his counsel deficient.

[¶ 38.] **c) Petitioner was advised that the habitual information filed against him was unconstitutional and that the prior convictions alleged were subject to challenge.**

[¶ 39.] Petitioner contends that he was specifically told the habitual information filed against him was unconstitutional. However, the record shows that trial counsel filed a post-conviction motion challenging the constitutionality of the habitual offender sentencing scheme. The habeas court found the trial court did not explain the consequences of the Part II information to Petitioner. However, there is absolutely no evidence in the record to indicate Petitioner would have accepted the plea bargain and entered a guilty plea to a crime he maintains to this day he did not commit.

[¶ 40.] It is ten years after the fact that Petitioner comes forward and asserts he would have accepted the plea bargain, but failed to do so as he did not understand that he would be convicted. The record indicates Petitioner knew and understood the charges against him, and understood that he was at risk for a mandatory life sentence if convicted. Petitioner's lack of understanding of the inherent risks faced by all defendants going to trial is irrelevant to the effectiveness of his trial counsel.

[¶ 41.] Petitioner testified that at the time of the trial, he would not have en-

marriage and is not intended for disclosure to any other person."

tered a guilty plea to a crime he did not commit, and that the decision not to accept the plea offer was solely his. It is disingenuous for Petitioner to now claim that if he had known he would be convicted he would have accepted the plea bargain. This is a case where Petitioner rolled the dice and took his chances on going to trial versus accepting what he admits was "the ultimate plea bargain of all plea bargains." In hindsight, Petitioner may feel he chose poorly and now attempts to cry ineffective assistance of counsel and select anew.

[¶ 42.] Trial counsel developed a viable trial strategy, investigated and interviewed witnesses, and presented a coherent defense. Trial counsel worked diligently to get Petitioner's custodial interview suppressed, resisted the habitual offender Part II information, and briefed the constitutionality of the recently enacted habitual offender statute. It cannot be said that the habeas court was clearly erroneous in its determination that counsel was not deficient. We affirm.

[¶ 43.] SABERS, KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.