#24883-a-JKK

**2009 SD 42**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

WILLIAM GUTHRIE,                                    Petitioner and Appellant,

   v.

DOUGLAS WEBER, WARDEN,
SOUTH DAKOTA STATE PENITENTIARY,        Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE TIM D. TUCKER
Judge

* * * *

MICHAEL J. BUTLER                          Attorney for petitioner
Sioux Falls, South Dakota                  and appellant.

LAWRENCE E. LONG
Attorney General

SHERRI SUNDEM WALD
Deputy Attorney General                    Attorneys for respondent
Pierre, South Dakota                       and appellee.

* * * *

ARGUED ON MARCH 23, 2009

OPINION FILED **06/10/09**

#24883

KONENKAMP, Justice

[¶1.]     Petitioner was convicted in 2001 of the murder of his wife.  He sought habeas corpus relief in circuit court asserting that his trial counsel was ineffective for failing to move to suppress evidence obtained with a search warrant and subpoenas duces tecum.  The habeas court denied relief.  It concluded that the warrant was supported by probable cause and that, although the subpoenas violated petitioner's right of privacy, the evidence would have been inevitably discovered.  Petitioner appeals and we affirm.

**Background**

[¶2.]     On May 14, 1999, Sharon Guthrie drowned in the bathtub of her home.  Her husband, Petitioner Dr. William B. Guthrie, called 911 for emergency assistance.  Sharon was taken to the hospital but could not be resuscitated.  She was pronounced dead the next day.  An autopsy revealed the presence of a debilitating and toxic level of Temazepam (Restoril), a prescription sleep medication.  Unable to conclusively determine the cause of death, the pathologist declared it was either a suicide or homicide.

[¶3.]     As the investigation progressed, suspicion on Guthrie, a Presbyterian minister, began to mount.  Unhappy in his marriage, he had planned a divorce.  Indeed, for six or seven years he had repeatedly told his youngest daughter, Danielle, that he hated Sharon, that she was fat and ugly, that she so disgusted him he could not force himself to touch her.  Guthrie gave investigators and others inconsistent versions of the circumstances surrounding his wife's death.  After first denying it, he admitted a long-term affair that started while he was a minister in

-1-

Nebraska. Several strange mishaps in the months before Sharon's death only raised more questions about Guthrie's criminal involvement.[*]

[¶4.]     We turn to the background pertinent to this habeas appeal. During the investigation, the Beadle County State's Attorney served subpoenas duces tecum on several drug stores in the area. These subpoenas directed the pharmacies to turn over Guthrie's prescription records. The records revealed that Guthrie had several prescriptions filled for Temazepam shortly before Sharon's death. A search warrant was issued for Guthrie's residence and his office and personal effects at the Presbyterian Church allowing search and seizure of, among other things, Guthrie's computer located at his church office. DCI Agent Jerry Lindberg's affidavit in support of the warrant requested seizure of "the diary kept by William Guthrie of his activities and the computer he uses in his office for evidence of any conspiracy between he and his love interest, Debbie Christensen." The affidavit also requested permission to search for "any correspondence, such as love letters or cards from Debbie Christensen."

[¶5.]     Forensic examination of the church computer revealed that before Sharon's death it had been used for repeated Internet queries on "household accidents" and "bathtub accidents." In addition to these searches, the church computer had also been used to explore the Internet on details about prescription drugs. An online search engine was engaged to look for such medications as "Lorazepam," "Ativan," "Ambien," and "TCA." Information available on the Internet

---

[*]     For a more detailed statement of the facts, see the opinion affirming the conviction: *State v. Guthrie*, 2001 SD 61, 627 NW2d 401.

was downloaded from drug manufacturers and other sites, all describing these drugs, their purposes, and their dangers. Although the date could not be isolated, one of the searches brought up a Website promoting a book entitled "Worst Pills Best Pills — A Consumer's Guide to Avoiding Drug-Induced Death or Illness." Listed among the 160 "do not use" prescriptions was a medication called Restoril (Temazepam). This medication carries dangerous consequences if taken improperly. Overdosage symptoms include: somnolence; confusion with reduced or absent reflexes; respiratory depression; apnea; hypotension; impaired coordination; slurred speech; seizures; and ultimately coma and death. *See Guthrie,* 2001 SD 61, ¶13, 627 NW2d at 409. The last Internet search concerning drugs on the church computer that month was on April 27, 1999.

[¶6.] This search information was significant at trial because the evidence showed that on April 29, 1999, two days after the last Internet drug search, Guthrie went to a local clinic complaining of insomnia. He declined a suggested prescription for Ambien and obtained a prescription for Temazepam, even though the prescribing physician's assistant had reservations about its side effects. Guthrie received a prescription for fifteen capsules at thirty-milligram strength, with three refills. Thereafter, in two weeks' time, he managed to obtain 60 Temazepam capsules. After this evidence was introduced at Guthrie's trial, the prosecutor called it "the most damaging evidence in this case."

[¶7.] Following his conviction and unsuccessful appeal, Guthrie petitioned the circuit court for a writ of habeas corpus. He averred ineffective assistance of counsel in his trial attorney's failure to move to suppress the information acquired

from his church office computer and the evidence obtained with the investigative subpoenas duces tecum. At the evidentiary hearing, Guthrie's habeas attorney argued that the affidavit in support of the search warrant lacked any basis in fact, or a nexus, for the issuing court to reasonably conclude that the church office computer would contain evidence of a conspiracy Guthrie might have had with Christensen. Counsel maintained that there was no basis to conclude there had been electronic correspondence between Guthrie and Christensen. Guthrie's trial counsel testified that his failure to move to suppress the evidence was "pure oversight on [his] part." The habeas court declined to address whether Guthrie's trial counsel was ineffective, instead holding that Guthrie failed to establish that the warrant lacked probable cause. The court found that although the computer was only mentioned once in the affidavit, "evidence of a potential conspiracy and intimate relationship between Guthrie and Christensen is prevalent throughout the affidavit."

[¶8.] On Guthrie's claim that the investigative subpoenas were illegal, the habeas court agreed that Guthrie had an expectation of privacy in his prescription records, and therefore, the court ruled that his Fourth Amendment rights had been violated. Again declining to address whether Guthrie's trial counsel was ineffective, the court denied habeas relief based on its sua sponte ruling that the prescription records would have been inevitably discovered. The court further held that even if the evidence would not have been inevitably discovered, Guthrie suffered no prejudice, as the evidence of his guilt was overwhelming.

[¶9.] In this appeal, Guthrie asserts that (1) the affidavit in support of the search warrant did not establish probable cause to seize and search the church computer, and (2) the court erred when it concluded that the evidence seized with the illegal subpoenas duces tecum would have been inevitably discovered.

**Standard of Review**

[¶10.] A writ of habeas corpus is a collateral attack on a final judgment. *Baldridge v. Weber*, 2008 SD 14, ¶21, 746 NW2d 12, 17 (citations omitted). Our standard of review is limited. *Id.* "As a general matter, habeas corpus is used to review only: (1) whether the court has jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) whether, in certain cases, a defendant was deprived of basic constitutional rights." *Id.* (quoting *Moeller v. Weber*, 2004 SD 110, ¶10, 689 NW2d 1, 6 (citing *New v. Weber*, 1999 SD 125, ¶5, 600 NW2d 568, 571-72)). Here, Guthrie claims he was deprived of certain Fourth Amendment rights because his trial counsel was ineffective. A claim of ineffective assistance of counsel is a mixed question of law and fact. *Denoyer v. Weber*, 2005 SD 43, ¶18, 694 NW2d 848, 854 (citations omitted). Guthrie must show that "trial counsel's errors were so serious that [counsel] was not functioning as counsel guaranteed by the Constitution." *See id.* ¶19 (citations omitted). In addition, because Guthrie's ineffective counsel claim asserts a Fourth Amendment violation, he "must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence[.]" *See* Luna v. Solem, 411 NW2d 656, 659 (SD

1987) (citation omitted); *see also* Cordell v. Weber, 2003 SD 143, ¶8, 673 NW2d 49, 53.

## Analysis and Decision

### 1. Probable Cause

[¶11.] In a claim that an affidavit for a search warrant lacked probable cause, we review the totality of the circumstances to determine "if there was at least a 'substantial basis'" for the issuing judge to find probable cause. State v. Jackson, 2000 SD 113, ¶8, 616 NW2d 412, 416 (citation omitted). The affidavit must provide the issuing judge with sufficient information to make "a 'common sense' decision that there was a 'fair probability' the evidence would be found on the persons or at the place to be searched." *Id.* The Fourth Amendment requires that there be a nexus between the item to be seized and the alleged criminal activity. *Id.* ¶13. However, there is a strong preference for searches conducted with a warrant. *Id.* ¶9. Therefore, when deciding whether an affidavit established "probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 US 102, 109, 85 SCt 741, 746, 13 LEd2d 684 (1965); *see also* State v. Boll, 2002 SD 114, ¶44, 651 NW2d 710, 721 (Konenkamp, J., concurring specially); State v. Iverson, 364 NW2d 518, 522 (SD 1985) ("[e]very reasonable inference possible should be drawn in order to support the determination of probable cause").

[¶12.] Agent Lindberg's affidavit for a search warrant included over eleven pages detailing the substance of the investigation supporting the need for a warrant. The affidavit detailed the facts surrounding Sharon's suspicious death:

she was found unconscious in her bathtub, an autopsy showed the presence of three drugs (one being a drug prescribed to Guthrie, Temazepam), and Guthrie gave inconsistent explanations regarding Sharon's death. The affidavit also related various interviews Agent Lindberg conducted with Guthrie's children, an EMT who arrived at the scene, members of Guthrie's church board, Sharon's co-workers, a physician who treated both Sharon and Guthrie, a physician who treated Sharon, a physician's assistant who treated Sharon and Guthrie, the neighbors, and a telephone interview with the executive presbyter of the church at which Guthrie worked before his current position.

[¶13.]     The interviews recounted in the affidavit were consistent in describing Sharon and Guthrie's relationship: they were having serious marital problems, Guthrie had been having an affair, Guthrie was verbally abusive to Sharon, and Guthrie had a temper. One witness said that Sharon told her that she and Guthrie had not been intimate since their move from Nebraska because he claimed he could not perform as a result of having been sexually abused. Most of the witnesses interviewed were aware of Guthrie's affair and Sharon's knowledge of it. Many witnesses were also aware of Guthrie's claim that he had been sexually abused in Nebraska and was receiving counseling in Nebraska for the abuse. Guthrie told his daughter, Suzanne, that he was going to divorce Sharon after the wedding of Jenalu, another daughter. The wedding was set for June 7, 1999. Danielle, another daughter, said that Guthrie was "miserable and unhappy and was planning on getting a divorce." Danielle was also aware of Guthrie's affair with Christensen and stated that Sharon found love letters from Christensen to Guthrie in Guthrie's

pants pocket. Danielle also thought that her father's trips to Nebraska for counseling were, in reality, trips to see Christensen.

[¶14.] Agent Lindberg's affidavit also described his separate interviews with Guthrie and Debbie Christensen. Guthrie admitted his sexual relationship with Christensen and said that he had seen her as recently as February 1999. He also admitted that Sharon was aware of the affair and claimed that Sharon threatened suicide if Guthrie did not end it. Guthrie admitted that he had called Christensen after Sharon's death. Agent Lindberg's interview of Christensen confirmed most of Guthrie's admissions. She explained that the two began having an affair when Guthrie was the pastor at her church in Orleans, Nebraska. She said a sexual relationship began and continued until January 1999. Christensen broke off the relationship because she was tired of sneaking around and did not believe Guthrie would leave Sharon. She stated that since Guthrie moved to South Dakota she called him frequently at his church and spent time meeting him in Nebraska and Kansas when she traveled for work. They spent anywhere from two to five days together at a time, but the last time she was with him was either February 26, 1999 or March 5, 1999. She said that after Sharon's death, when Guthrie called her, he asked to get together, but she refused.

[¶15.] Summarizing the information gathered from his investigation and the interviews, Agent Lindberg's affidavit proposed that "a torrid romance carried on over a period of years would provide motive for Guthrie to want to be rid of his wife, Sharon, to be free and pursue something that was important enough to live a lie with family and business associates for years." According to Agent Lindberg,

"William Guthrie has been found to be a blatant liar and has a motive, one of the world's oldest, lust for another woman, that impaired his judgment and reasoning. He has lied to his family, friends, and to investigating officers[.]" Accordingly, Agent Lindberg requested permission to search Guthrie's residence and "office and personal effects at the Presbyterian Church[.]" He asked for a search warrant for the following property: (1) "pictures and measurements" of the Guthrie residence, (2) "bathtub experiment," (3) "stairwell," (4) "diary of William Guthrie's daily activities," (5) "prescription drugs and/or remains of prescription drugs," (6) "letters and cards from Debbie Christensen," (7) "chocolate milk," and (8) "computer & discs." Also, in the closing page of his affidavit, Agent Lindberg asked to search for "any correspondence, such as love letters or cards from Debbie Christensen," and "the diary kept by William Guthrie of his activities and the computer he uses in his office for evidence of any conspiracy between he and his love interest, Debbie Christensen." (Emphasis added.).

[¶16.] In this appeal, Guthrie maintains that the affidavit in support of the search warrant provided no basis in fact to conclude that his office computer contained evidence of a crime — whether it was the crime of murder or a conspiracy between Christensen and himself. While the affidavit included many statements identifying the fact that Christensen and Guthrie were having an affair, according to Guthrie, there were no statements to support the inference that the computer would contain evidence that Guthrie and Christensen *conspired*. Guthrie argues that the affidavit made no mention that Guthrie and Christensen communicated by email or that law enforcement officers ever asked Christensen if she and Guthrie

used computers to communicate. According to Guthrie, it is unreasonable to infer, simply because an affair existed, that a computer was used between Christensen and Guthrie to communicate. Absent any specific facts connecting the computer to criminal activity, Guthrie claims that the request to search his church office computer for evidence of a conspiracy was "the proverbial fishing expedition prohibited by the Fourth Amendment."

[¶17.] From examining the information contained within the four corners of the affidavit, the affidavit goes beyond merely mentioning that Guthrie and Christensen had an affair. Agent Lindberg's affidavit stated not only that Guthrie had an affair, but that the affair had been on going, was obviously significant to Guthrie, and the affair and all the bizarre events preceding Sharon's death had led officers to believe that Guthrie was motivated to murder his wife. Moreover, two of Guthrie's children indicated that the marriage was dysfunctional and that Guthrie was planning a divorce. Indeed, Christensen said that she broke off the affair with Guthrie in part because she thought he would not leave Sharon. Certainly it can be inferred that Guthrie felt pressure from Christensen to end his relationship with Sharon. Despite the fact that Christensen broke off the affair, the two continued to communicate and see each other in the months before Sharon died. Granted, Christensen did state that they spoke on the church phone, but it is sensible to conclude that in concealing a sexual relationship with someone other than your spouse, one might also use other modes of communication. One daughter stated that Sharon had found love letters from Christensen to Guthrie. A common sense inference from this is that Guthrie too would have given love letters to Christensen.

From this, it takes little deductive reasoning to conclude that a computer would have been used to compose correspondence both electronic and written.

[¶18.]        Therefore, the fact that the affidavit did not specifically state that Christensen and Guthrie corresponded by or with the use of a computer does not require us to declare that it was unreasonable for the issuing judge to infer that the computer would be a means of communication between Guthrie and Christensen. This affidavit provided a sufficient nexus between the crime and potential evidence on the computer, when considered in the totality of circumstances, mindful of the preference for searches conducted with a warrant. To conclude otherwise, to hold that the affidavit was insufficient to establish the narrow question whether there was sufficient probable cause for a "conspiracy," or to rule that only paper correspondence could be seized, would be to read the affidavit in a hyper-technical manner, a position we have consistently rejected. *See* State v. Helland, 2005 SD 121, ¶32, 707 NW2d 262, 273 (citing State v. Habbena, 372 NW2d 450, 456 (SD 1985)) (additional citations omitted). Our duty is to review the affidavit for sufficient information that would allow an issuing judge to make "a 'common sense' decision that there was a 'fair probability' the evidence would be found on the persons or at the place to be searched." *Jackson*, 2000 SD 113, ¶8, 616 NW2d at 416. Affidavits for search warrants are not required to recite every conceivable inference that an issuing judge might reasonably deduce from the facts.

[¶19.]        Considering (1) Guthrie's long-term affair with Christensen, (2) their communications by telephone and the love letters Christensen sent to him, (3) Christensen's decision to break off the affair in part because Guthrie would not

leave Sharon, (4) the deteriorating relationship between Guthrie and his wife before her death, (5) his inconsistent explanation of events, (6) the bizarre circumstances preceding Sharon's untimely and enigmatic demise, and (7) the fact that Guthrie and Christensen had spoken after Sharon's death, we think there was sufficient support in the affidavit for the issuing judge to make a common sense conclusion that it was fairly probable that officers would find evidence of a crime, such as incriminating correspondence or communication, on Guthrie's office computer.

[¶20.] The success of any ineffective assistance of counsel claim based on a Fourth Amendment violation depends on the petitioner proving "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence[.]" *Cordell,* 2003 SD 143, ¶8, 673 NW2d at 53 (quoting *Luna*, 411 NW2d at 659). Because Guthrie would not have prevailed on his Fourth Amendment claim, he cannot establish the necessary grounds for habeas relief. Guthrie has failed to show that even if his counsel was deficient in failing to move to suppress the evidence seized from his computer that the result of the proceedings would have been different.

### 2. Inevitable Discovery

[¶21.] Guthrie next argues that his trial counsel was ineffective for failing to move to suppress evidence obtained when the Beadle County State's Attorney issued investigative subpoenas duces tecum. Guthrie contends that the habeas court erred when it concluded, sua sponte, that the evidence obtained by the subpoenas would have been inevitably discovered. According to Guthrie, the State bore the burden of proving inevitable discovery by a preponderance of the evidence,

and because the State never argued the inevitable discovery doctrine, the court did not have authority to invoke it. The State asserts that no remand is necessary because the record unequivocally established that the evidence would have been inevitably discovered.

[¶22.]    In reviewing whether the use of an investigative subpoena was improper, the habeas court first considered whether Guthrie had a privacy interest in his prescription records. Comparing prescription records to medical records, the court concluded that the State should have sought a search warrant before seizing Guthrie's prescription records because they were "records which are subject to a constitutionally protected privacy interest" and records that Guthrie would have had a subjective expectation of privacy in, which expectation would have been reasonable. Nonetheless, the court held that Guthrie's illegally-seized prescription records would have been inevitably discovered because the State executed a valid search warrant for Guthrie's prescription *drugs*, which would have led the State to seek a search warrant to acquire Guthrie's prescription *records*. The court also found that Guthrie's *records* would have been legitimately admitted at trial through the testimony of the person who prescribed the *drugs* lawfully seized by law enforcement officers. Finally, the court held that even if the records were illegally seized and would not have been inevitably discovered, Guthrie suffered no prejudice as a result of the records admission at trial based on the overwhelming evidence of his guilt.

[¶23.]    In the habeas proceedings before the circuit court, the State never invoked the inevitable discovery doctrine. Rather, it maintained that the subpoenas

were valid. The inevitable discovery doctrine was first raised and addressed in the habeas court's memorandum opinion. Guthrie objected to the court's conclusion, asserting that a dispute existed concerning the court's finding of inevitable discovery since the State presented no evidence to support that theory.

[¶24.]    In *Nix v. Williams*, 467 US 431, 104 SCt 2501, 81 LEd2d 377 (1984), the United States Supreme Court adopted the inevitable discovery doctrine as an exception to the exclusionary rule. The Court held that when information is discovered after police violate the Fourth Amendment, the evidence should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means. . . ." *Id.* at 444, 104 SCt at 2509, 81 LEd2d 377. As such, "inevitable discovery of illegally seized evidence must be shown to have been more likely than not[.]" Bourjaily v. United States, 483 US 171, 176, 107 SCt 2775, 2779, 97 LEd2d 144 (1987) (summarizing *Nix*, 467 US at 444 n5, 104 SCt 2509 n5, 81 LEd2d 377). "The inevitable discovery doctrine applies where evidence may have been seized illegally, but where an alternative legal means of discovery, such as a routine police inventory search, would inevitably have led to the same result." *Boll*, 2002 SD 114, ¶21, 651 NW2d at 716 (citation and emphasis omitted).

[¶25.]    We have never addressed whether a court may sua sponte raise the inevitable discovery doctrine. Other courts have examined the issue: several allow sua sponte rulings; others reject them. Some courts have held that when there does not appear to be any additional evidence that could be offered to defeat the theory of inevitable discovery, a court's sua sponte ruling would not be held improper. People

v. Clark, 857 P2d 1099, 1125-26 (Cal 1993), *disapproved on other grounds*, People v. Doolin, 198 P3d 11 (Cal 2009); People v. Jones, 2008 WL 2253164, *3 (CalCtApp) (unpublished) (quoting People v. Watkins, 31 CalRptr2d 452, 458 (CalCtApp 1994)); State v. Dickinson, 184 P3d 305, 309-10 (Mont 2008); *accord* United States v. Garcia, 496 F3d 495, 505 (6thCir 2007) (court raised the inevitable discovery doctrine sua sponte). Several decisions have declared that a court may raise the issue sua sponte *only* if both parties are given an opportunity to be heard on the issue. United States v. Sinkler, 267 FedAppx 171, 174 (3dCir 2008); People v. Hicks, 539 NE2d 756, 762 (IllCtApp 1989); State v. Badgett, 512 A2d 160, 171 n10 (Conn 1986). Other courts, however, have held that when the State makes no argument and presents no proof that the evidence would have been inevitably discovered, a sua sponte ruling is improper. United States v. Lopez-Soto, 205 F3d 1101, 1107 (9thCir 2000); United States v. Scott, 2007 WL 1289920, *4 (WDVa) (unpublished). Based on our review of the case law and the intent behind the inevitable discovery doctrine, we conclude that a court's sua sponte ruling that evidence would inevitably have been discovered is proper only when there is no other evidence that could be offered to defeat the theory.

[¶26.]    In this case, the evidence is undisputed that law enforcement officers obtained a valid search warrant to seize Guthrie's prescription drugs in his home. It is logical to conclude that based on that independent source, the officers would have obtained a search warrant to seize Guthrie's prescription records. "[T]o gain application of the inevitable discovery doctrine, the government must establish not only that its employment of an independent, lawful investigative procedure was

inevitable, but also that that procedure inevitably would have led to the discovery of the same evidence actually found through the Constitutional violation." Wayne R. LaFave, 3 Crim. Proc. § 9.3(e) (3ded) (citations omitted). Thus, under the *Nix* formulation, had these records not been obtained with the subpoenas duces tecum, we believe it is more likely than not that law enforcement officers would have inevitably sought these records with a search warrant, an independent, lawful investigative instrument, and the search warrant inevitably would have led to the discovery of the same evidence actually obtained through the subpoenas duces tecum. Guthrie cannot refute this, and therefore, the habeas court's sua sponte ruling was proper. Assuming, without deciding, that the subpoenas duces tecum were invalid, we uphold the habeas court's ruling that the evidence would have been inevitably and lawfully discovered through the use of a search warrant. In view of this conclusion, we need not address the habeas court's alternative ruling that Guthrie was not prejudiced by the admission of his prescription records because there was overwhelming evidence to support the jury's guilty verdict.

[¶27.]        Affirmed.

[¶28.]        GILBERTSON, Chief Justice, and ZINTER, Justice, and SABERS, Retired Justice, concur.

[¶29.]        MEIERHENRY, Justice, concurs in result.


MEIERHENRY, Justice (concurring in result).

[¶30.]        I agree with the conference opinion on issue one but disagree with the analysis on issue two. The inevitable discovery doctrine was inappropriately raised

sua sponte by the circuit court and should not be the basis of this Court's affirmance of issue two.

[¶31.] The circuit court determined that Guthrie had a reasonable expectation of privacy in his prescription drug records protected against search and seizure without a warrant. *See* Douglas v. Dobbs, 419 F3d 1097, 1102 (10thCir 2005) ("concluding that protection of a right to privacy in a person's prescription drug records, which contain intimate facts of a personal nature, is sufficiently similar to other areas already protected within the ambit of privacy"); *see also* Whalen v. Roe*,* 429 US 589, 602, 97 SCt 869, 878, 51 LEd2d 64 (1977) (determining that individuals have a limited right to privacy in their medical records). Consequently, the circuit court determined that the State should have sought a search warrant before seizing the prescription records rather than using a subpoenas duces tecum. *See* Doe v. Se. Pa. Transp. Auth. (SEPTA), 72 F3d 1133, 1138 (3dCir 1995) ("An individual using prescription drugs has a right to expect that such information will customarily remain private."); King v. State, 535 SE2d 492, 497 (Ga 2000) (holding that a defendant's medical records cannot be subpoenaed "in the absence of waiver and without notice to the accused or an opportunity to object").

[¶32.] The circuit court was correct, and the State does not defend the use of a subpoenas duces tecum on appeal. Consequently, failure of Guthrie's trial counsel to challenge the seizure was ineffective assistance of counsel. Nevertheless, Guthrie still had the burden of showing prejudice. Even if the pharmacy records had been suppressed, there was other evidence of Guthrie's drug prescriptions. The

physician's assistant, Jean Thompson, testified that she had seen Guthrie as a patient on April 29, 1999, and had prescribed Restoril for his complaints of insomnia. Thompson also testified that Guthrie's wife, Sharon, called later that morning and asked Thompson to call in the prescription because Guthrie had lost the first prescription. Thompson further testified that one of the first things that Guthrie said to Thompson at the time of the funeral was that "he didn't know anything about the second prescription being filled, that Sharon apparently filled a prescription for Restoril and was taking it without his knowledge." Thompson testified at length regarding all the drugs she had prescribed for both Guthrie and Sharon. Likewise, police officers had retrieved the prescription bottles from the home at the time of Sharon's death.

[¶33.]     In light of all the evidence, Guthrie has not shown a reasonable probability that the illegally seized pharmacy records would have affected the outcome of the trial. *Cordell*, 2003 SD 143, ¶8, 673 NW2d at 53 (quoting *Luna*, 411 NW2d at 659). The trial court determined that the other evidence overwhelmingly supported a guilty conviction. I would affirm on this basis. There is no need to delve into the inevitable discovery rule. The inevitable discovery doctrine only permits otherwise excluded evidence "[i]f the *prosecution* can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means. . . ." *Nix*, 467 US at 444, 104 SCt at 2503, 81 LEd2d 377 (emphasis added). The burden of proof rests with the prosecution. The State had not urged nor presented evidence to support inevitable discovery. Nevertheless, the circuit court applied the inevitable discovery doctrine post-

#24883

hearing without either party having an opportunity to address it. Here, it is unnecessary and ill-advised for a court to sua sponte apply a legal theory without any forewarning to the defendant. Neither the circuit court nor this Court should surmise what law enforcement may have done in this case. The court's role is to decide an issue based on the facts presented.