2002 SD 114

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William James BOLL, Defendant and Appellant.**

**No. 22140.**

Supreme Court of South Dakota.

Considered on Briefs May 28, 2002.

Decided Sept. 4, 2002.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, for plaintiff and appellee.

John R. Hinrichs, Minnehaha County Public Defender, Sioux Falls, for defendant and appellant.

ZINTER, Justice.

[¶ 1.] William James Boll was convicted of unauthorized manufacture of a controlled substance (methamphetamine) and possession of a controlled substance (methamphetamine) in violation of SDCL 22–42–2 and SDCL 22–42–5.[1] He appeals contending that the trial court erred in deny-

---

1. SDCL 22–42–2 provides that it is a Class 4 felony for any person to "manufacture, distribute or dispense a substance listed in Schedules I or II...." Methamphetamine is a Schedule II substance. SDCL 34–20B–16.

SDCL 22–42–5 provides that it is a Class 4 felony for any person to "knowingly possess a controlled drug or substance unless the substance was obtained directly or pursuant to a valid prescription or order from a practitioner ... or except as otherwise authorized by chapter 34–20B."

ing his motion to suppress the evidence seized at his home and on his person. That evidence was seized pursuant to a search warrant. However, the affidavit supporting the warrant contained some information obtained from a prior illegal search. After redacting all information derived directly and indirectly from the illegal search, we conclude that the remaining information in the affidavit fails to establish probable cause. We therefore reverse and remand.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] On December 13, 2000, the Sioux Falls Police Department received an anonymous letter from Casper, Wyoming. The author alleged that an individual, identified as "Cooley," had been manufacturing methamphetamine in the basement of his home near Hartford, South Dakota. The letter also indicated that on November 29, 2000, the author told "a detective" that Cooley "deals marijuana." The letter finally indicated that a woman and her children living in Cooley's residence were in danger.

[¶ 3.] Sioux Falls Police Sergeant Jerry Mundt corroborated that "Cooley" was Boll. Boll's criminal record indicated that Boll had used "Cooley" as an alias. Boll also lived at the address identified by the informant. Mundt was not, however, able to corroborate any other information in the letter.

[¶ 4.] The next day, December 14, Mundt and Minnehaha County Sheriff's Department Detective Tyron Albers drove to Boll's rural farmhouse. The officers intended to investigate the allegations of the anonymous letter. The officers did not attempt to contact Boll before visiting his residence. They also did not obtain a search warrant. Instead, they intended to conduct what they described as a "knock and talk" with Boll when they arrived.

[¶ 5.] The officers drove to Boll's residence, found Boll's vehicle at home, but no one answered when the officers knocked on the front door. At this time Mundt made two observations. He first noticed that a gas grill near the front door had a missing propane tank. Mundt also observed footprints in the snow leading to a chicken coop within the curtilage of the house.

[¶ 6.] Instead of leaving upon making these discoveries, Mundt walked across the yard to the chicken coop. Although the door to that building was secured by a metal fence-post, Mundt removed the fence-post, opened the door, and looked inside.

[¶ 7.] Mundt immediately noticed evidence of an illegal methamphetamine laboratory. He first smelled a "strong odor of chemicals," and he observed a "toluol container." He also observed a propane tank that had a blue-green discoloration around the valve. Based upon his expertise in detecting clandestine drug labs, the discoloration indicated that anhydrous ammonia, a necessary component in the manufacture of methamphetamine, had been transported in the tank. The chemical odor and toluol container were also indicative of an illegal methamphetamine lab.

[¶ 8.] After making these observations, Mundt shut the door and replaced the fence-post that secured the door. He then advised Detective Albers, "well, I'm positive there is a meth lab here but unfortunately what I just did we can't use to get a warrant."

[¶ 9.] Five days later, on December 19, Mundt and Albers drove to Boll's residence to investigate again. They were accompanied by Sioux Falls Police Detective Jim Severson. This time the officers

did not immediately approach the house. Instead, they parked on a hill about a half-mile away and observed Boll's farmyard with binoculars. With the binoculars, Mundt could see that the door to the chicken coop was now open. Although Boll's vehicle was not present, and although they had no search warrant, the officers then attempted to drive to Boll's house. However, because Boll's half-mile long driveway was blocked with snow, they walked through a cornfield to get to the residence.

[¶ 10.] When the officers reached the house, they knocked on the door, but no one answered. The officers then walked about 200 feet across Boll's yard and inspected some "burn barrels" that were near the path they had used to approach the house. Mundt also walked to the now open door of the chicken coop and looked inside. He observed that the discolored propane tank was still present. Mundt and Severson then inspected the contents of the burn barrels and discovered two metal cans, one of which was labeled as toluol. They also found melted plastic that resembled pill containers. The officers left the premises without physically seizing this evidence.

[¶ 11.] Later that same day, Mundt prepared an affidavit in support of a search warrant for Boll and his residence. In the affidavit, Mundt related the contents of the anonymous letter. Mundt also described his expertise in the investigation of clandestine methamphetamine labs and the methods used to manufacture methamphetamine. Mundt's affidavit finally described the events and observations made at Boll's residence. Paragraph 3 described the observations made on December 14, and paragraph 4 described the observations made on December 19. However, Mundt did not mention that he knew he had illegally entered on the first visit and could not use that illegally obtained information to get a search warrant. Mundt stated:

3. On 12–14–2000 Detective Tyrone Albers and I responded to 26150 466th Avenue to speak with Mr. Boll. A red [p]ick-up (sic) ..., registered to Mr. Boll, was parked next to the residence but no one answered the door. I did notice a gas grill, minus the propane tank, placed outside the only door to the residence and several outbuildings near the residence. I saw footprints leading up to the shed next to the house and, upon opening the door, smelled a strong odor of chemicals and a propane tank with blue-green discoloration around the valve. I resecured the door at that time and we left the farmplace.

4. On 12–19–2000 Detective Albers, Severson and I again responded to Bolls' [sic] residence. The pick-up [sic] was gone and no one answered the door. The shed next to the house had the door standing open. While standing outside the shed I noticed ... (just as it was on 12–14–2000), a propane cylinder with a blue-green residue around the brass valve. I know from my training and experience that brass turns blue-green after it is exposed to anhydrous ammonia, a necessary element in the manufacture of methamphetamine using the "nazi" method. We also located a small burning barrel about 30 feet from this shed. The burned contents included[:] two square cans, one of which was toluol, a common solvent used in the manufacture [of] methamphetamine and some sort of melted plastic which may have been old pill containers, like the ones used to store mini-thins (psuedoephedrine).

Mundt concluded that the items observed were indicative of an illegal methamphetamine lab at Boll's residence.

[¶ 12.] Based upon this affidavit, a magistrate judge signed a search warrant for Boll's home, vehicle, and person. The warrant was executed the next day, December 20, when Boll was not home. The officers found evidence consistent with the presence of a clandestine methamphetamine lab in Boll's home. They later found a glass vial and a "pen tube" containing methamphetamine on Boll's person.

[¶ 13.] Boll was subsequently charged with one count of unauthorized manufacture of a controlled substance and one count of possession of a controlled substance. Prior to trial, Boll filed a motion to suppress the evidence seized from his person and at his residence. After a hearing, the motion was denied. A jury ultimately found Boll guilty of both charges.[2] Boll now appeals from trial court's denial of his motion to suppress.

## STANDARD OF REVIEW

[¶ 14.] "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo. We review findings of fact under the clearly erroneous standard. Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *State v. Myhre*, 2001 SD 109, ¶ 9, 633 N.W.2d 186, 188 (internal citations omitted).

## DECISION

[¶ 15.] The trial court observed that there were three elements within the four corners of the affidavit that supported a probable cause determination: (1) the information about "Cooley" received in the anonymous letter from Wyoming, (2) the information in paragraph 3 which related the police officers' observations made at Boll's residence on December 14, and (3) the information in paragraph 4 which related the police officers' subsequent observations made at Boll's residence on December 19.

[¶ 16.] The trial court considered each element and concluded that standing alone, the anonymous letter did not establish probable cause.[3] The trial court also concluded that the information obtained from the December 14 entry of the chicken coop could not be used to establish probable cause because it was the product of an illegal search.[4] The trial court did, however, find that even in the absence of the illegal search, the police would have inevitably gone back to the premises because of the anonymous letter. Therefore, the trial court concluded that the information gathered from the December 19 visit could be used to support the search warrant because it was not based "exclusively" on the December 14 illegal search. Although the trial court was troubled by the December 14 illegal search, the court ultimately concluded that if the December 14 information were redacted from the affidavit, the remaining anonymous tip and observations of December 19 established probable cause for the warrant.[5]

[¶ 17.] The trial court's analysis involved application of two exceptions to the exclusionary rule: the inevitable discovery doctrine and a version of the independent

---

2. At trial the officers excluded any reference to the illegal observations gleaned from their December 14 visit to Boll's residence (paragraph 3 of the affidavit).

3. The State did not file a notice of review on this ruling.

4. The State did not file a notice of review on this ruling.

5. The trial court relied on *United States v. Williams*, 633 F.2d 742 (8th Cir.1980).

source doctrine. Under the first exception, illegally seized evidence may be used if it would have been inevitably discovered by lawful means. Under the second exception, a search warrant that is partially based upon tainted evidence and partially based on evidence arising from an independent source need not be invalidated if the lawfully obtained evidence establishes probable cause apart from the tainted information. *People v. Weiss,* 20 Cal.4th 1073, 86 Cal.Rptr.2d 337, 978 P.2d 1257 (1999); *State v. Revenaugh,* 133 Idaho 774, 992 P.2d 769 (1999); *United States v. Herrold,* 962 F.2d 1131 (3dCir.1992); *United States v. Restrepo,* 966 F.2d 964 (5thCir.1992). *See also State v. Wagoner,* 130 N.M. 274, 24 P.3d 306, 311 (Ct.App. 2001).

[¶ 18.] We now review the exclusionary rule and these exceptions. We then consider whether the December 19 observations and the evidence seized under the search warrant may be used under those exceptions as well as under the good faith exception to the exclusionary rule.

[¶ 19.] Generally, "[t]he exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States,* 487 U.S. 533, 536, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 at 480 (1988). It also "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Id.* at 536–37, 108 S.Ct. at 2533, 101 L.Ed.2d at 480 (citing *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939)). The purpose of the exclusionary rule is to deter police misconduct. *State v. Belmontes,* 2000 SD 115, ¶ 13, 615 N.W.2d 634, 638.

### The Inevitable Discovery Exception to the Exclusionary Rule

[¶ 20.] The inevitable discovery doctrine, also known as the hypothetical independent source doctrine, is an exception to the exclusionary rule. Under this exception, "illegally obtained evidence may be admitted if the evidence ultimately would have been discovered by legitimate means." *State v. Shearer,* 1996 SD 52, ¶ 21, 548 N.W.2d 792, 796–97 (citing *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387–88 (1984)). "The inevitable discovery doctrine ... is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray,* 487 U.S. at 539, 108 S.Ct. at 2534, 101 L.Ed.2d at 481–82 (emphasis in original). *See also Wagoner,* 24 P.3d at 311.

[¶ 21.] The inevitable discovery doctrine does, however, have limited application. *Wagoner* succinctly pointed out that the inevitable discovery is hypothetical in nature and therefore, it does not apply if the alternative, legitimate source is actually used to seize the evidence.

The inevitable discovery doctrine applies where evidence may have been seized illegally, but where an alternative legal means of discovery, such as a routine police inventory search, *would inevitably have led* to the same result. For the doctrine to apply, the alternate source of evidence *must be pending, but not yet realized. If the alternate source has been realized, and the evidence seized or "reseized" according to this alternate source, the inevitable discovery doctrine*

*is no longer applicable. Instead, the admissibility of the evidence must be evaluated under the independent source doctrine.*

*Wagoner,* 24 P.3d at 311 (emphasis added).

■ [¶ 22.] In this case, the inevitable discovery doctrine does not apply because the search warrant and the December 19 observations were not hypothetical events.[6] Both events occurred and were used to seize (or reseize) the incriminating evidence at issue. Because the inevitable discovery doctrine is inapplicable in cases like this where the hypothetical, alternate source has been realized, we next consider whether the December 19 observations and the fruits of the search warrant could be used under the independent source doctrine.

### The Independent Source Exception to the Exclusionary Rule

■ [¶ 23.] The independent source doctrine applies when evidence is legally seized through a source independent of an illegal search. The exception was first recognized by the United States Supreme Court in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), overruled on other grounds by *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). The *Silverthorne* Court held that although the exclusionary rule forbids any use of illegally seized evidence, "[i]f knowledge of [the evidence] is gained from an independent source [it] may be proved like any [other]...." 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321.

[¶ 24.] The Supreme Court considered the independent source doctrine again in *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). In *Segura,* the defendants were arrested in their apartment for drug trafficking. After the arrest, the officers conducted an illegal warrantless sweep of the defendants' apartment and observed drug paraphernalia. The purpose of the sweep was to secure the apartment while the officers waited for a warrant to conduct a full search. Although the sweep was illegal, no information obtained during the sweep was used to procure the warrant. 468 U.S. at 814, 104 S.Ct. at 3390, 82 L.Ed.2d at 614. Under those circumstances, the Supreme Court held that the evidence obtained pursuant to the valid warrant was admissible as an independent source. 468 U.S. at 816, 104 S.Ct. at 3391, 82 L.Ed.2d at 616.

[¶ 25.] In reaching its holding, the Court emphasized the independent nature of the evidence:

*None* of the information on which the warrant was secured was derived from or related in *any way* to the initial entry into petitioners' apartment; the information came from sources *wholly unconnected* with the entry and was known to the agents well *before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant.* It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged.

468 U.S. at 814, 104 S.Ct. at 3390, 82 L.Ed.2d at 614–15 (emphasis added).

■ [¶ 26.] Later, in *Murray,* the United States Supreme Court identified

---

**6.** We also note that "for inevitable discovery to apply, the lawful means by which the evidence could have been attained must be *wholly independent of the illegal actions." Wagoner,* 24 P.3d at 311 (emphasis added).

two circumstances where a search warrant will not qualify as an independent source. The Court specifically cautioned that a warrant would not qualify as an independent source "if the agents' decision to seek the warrant *was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.*" *Murray,* 487 U.S. at 542, 108 S.Ct. at 2536, 101 L.Ed.2d at 483–484 (emphasis added). Both of these disqualifying circumstances prevent the use of the December 19 observations and the fruits of the search warrant in Boll's case.

[¶ 27.] The use of the December 19 information is prohibited by the first *Murray* disqualification because the illegal search of Boll's property on December 14 partially prompted the officers' observations on December 19, which further prompted the decision to obtain a search warrant. We acknowledge that Mundt testified, and the trial court found, that Mundt would have continued to *investigate* the matter because of the letter alone. However, the officers' return and look into the coop on December 19, and the resulting decision to get the warrant, were *prompted at least in part* by the illegal search on December 14.

[¶ 28.] The officers' conduct compels that conclusion. On December 19, the officers returned to the residence after Mundt's illegal December 14 search and resulting declaration: "well I'm positive this is a meth lab here but unfortunately what I just did we can't use to get a warrant." Although they did not stop and use binoculars on December 14, they did so on December 19. The officers immediately noted that the chicken coop door was now open. This fact, and the subsequent re-entry of the coop, were important to the officers only because they exploited the information they obtained from the initial, illegal observations in the coop on December 14.

[¶ 29.] Moreover, on December 19 they observed that Boll's vehicle was not present and the half-mile long driveway was blocked with snow. Nevertheless, they proceeded to the home to purportedly talk with Boll. When they confirmed that he was not at home, they then walked through the snow and looked again into the chicken coop. Although the door to the chicken coop was now open making the interior arguably subject to plain view, the plain view exception to the warrant requirement was unavailable because the December 19 view revealed the same evidence observed during the prior illegal entry on December 14. *See State v. Corder,* 460 N.W.2d 733, 737 (S.D.1990) (stating "[p]lain view requires that the evidence be discovered inadvertently, in other words, that the officers did not know in advance the location of the evidence")(citing *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)).

[¶ 30.] In addition to the officers' conduct, Mundt admitted that their return on December 19 was partly prompted by the December 14 illegal search. At the suppression hearing, Mundt testified:

Question: Is it fair to say that a good portion of the reason you went back [to Boll's residence] on the 19 is because of suspicious activity you observed when you were there on the 14?

Answer: Well, we were still trying to follow upon the letter thing, looking for suspicious activity, yes. *Correct.*

Question: Were you following up on the fact you saw the canister in there, too?

Answer: We were still following up on the case I guess, *yes.*

Question: *That obviously cemented your earlier suspicions?*

Answer: *It made me feel this was the kind of lab that we were looking at; that we were looking at an ephedrine reduction method lab, yes.*

This testimony clearly indicated that the police decision to return on December 19 (which ultimately led to the search warrant) was prompted in part by the illegal search.

[¶ 31.] This conclusion is finally supported by the trial court's findings. After conducting the suppression hearing, the trial court did not find that the December 19 investigation was wholly independent of the December 14 observations. On the contrary, the trial court only found that the December 19 visit was not based "exclusively on the illegal act that occurred on December 14." The inescapable inference is that although the officers' visit on the 14th may not have been the *exclusive* reason for their return, the illegal search remained at least a part of the reason for the December 19 return. As the trial court noted, "once the police saw what was in the shed [on the 14th] there was no question in heaven or earth that they were going to go out there again."

[¶ 32.] The exclusionary rule prohibits this type of derivative evidence that is the indirect product or fruit of illegal police conduct. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Evidence is not " 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488, 83 S.Ct. at 417, 9

L.Ed.2d at 455 (internal citations omitted). Because the December 19 observations (and the subsequent search warrant) were obtained by partially exploiting the illegal December 14 search, the primary taint was not purged. Moreover, because the December 19 observations were partially prompted by what was observed during the illegal observation, the first *Murray* disqualification is present, and the independent source doctrine is not available.

[¶ 33.] The independent source doctrine is also unavailable because of the second *Murray* disqualification. Under that disqualification, "if information obtained during [the illegal] entry was presented to the Magistrate and affected his decision to issue the warrant," the independent source rule does not apply. *Murray,* 487 U.S. at 542, 108 S.Ct. at 2536, 101 L.Ed.2d at 483. Here, both the illegal December 14 observations and the tainted December 19 observations were included in the affidavit that was presented to the magistrate judge. Because that information clearly affected the magistrate's decision to issue the warrant, the independent source doctrine is also inapplicable under the second *Murray* disqualification.

### The Expanded Independent Source Doctrine

[¶ 34.] Notwithstanding these *Murray* disqualifications, several state and federal courts have expanded the independent source doctrine to allow partially tainted warrants if the remaining untainted information establishes probable cause. *See, e.g., Weiss,* 86 Cal.Rptr.2d 337, 978 P.2d at 1263; *Revenaugh,* 992 P.2d at 774–75; *Herrold,* 962 F.2d at 1141–42; *Restrepo,* 966 F.2d at 970. Generally, courts have adopted this expansion of the independent source doctrine because they were unwilling to put the police in a position worse than they would have been in had they not

acted illegally. *See Herrold*, 962 F.2d at 1141.[7]

[¶ 35.] Under the expansion, the question is whether "the remaining information presented to the magistrate, after the tainted evidence is excluded, contains adequate facts from which the magistrate could have concluded that probable cause existed for the issuance of the search warrant." *Revenaugh*, 992 P.2d at 774 (additional citations omitted). *See also Weiss*, 86 Cal.Rptr.2d 337, 978 P.2d at 1263 (stating "if the [affidavit] contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies ...").

■■■ [¶ 36.] However, this affidavit fails even under that expansion. As the California Supreme Court noted in *Weiss*, "the officers [may not be] prompted to obtain the warrant by what they observed during the initial entry." *Id.* (citing *Restrepo*, 966 F.2d at 970). Here, the police were partially prompted to return and obtain a warrant because of what they observed on December 14. Therefore, the expanded independent source doctrine cannot save the evidence from the exclusionary rule because the observations from both visits must be redacted, and the remaining anonymous letter fails to establish probable cause.[8]

## The Good Faith Exception To The Exclusionary Rule

■■■ [¶ 37.] The State finally argues that we should apply the good faith exception to the exclusionary rule. The good faith exception was adopted by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The *Leon* court explained:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the *official action was pursued in complete good faith,* however, the deterrence rationale loses much of its force.

*Leon*, 468 U.S. at 919, 104 S.Ct. at 3418, 82 L.Ed.2d at 696 (emphasis added). We adopted the good faith exception in *State v. Saiz*, 427 N.W.2d 825, 828 (S.D.1988) (stating "evidence is admissible when police officers *reasonably rely* on a warrant that is subsequently invalidated because a judge finds there was an insufficient basis for the issuing magistrate to find probable cause") (emphasis added).

■■■ [¶ 38.] To qualify for the good faith exception, the offending officer must have "acted in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment." *Leon*, 468 U.S. at 918, 104 S.Ct. at 3418, 82 L.Ed.2d at 696; *Belmontes*, 2000 SD 115 at ¶ 14, 615 N.W.2d at 638 (stating "[t]his good faith

---

7. Other courts have not expanded the doctrine. *See Wagoner*, 24 P.3d at 315; *State v. Lewis*, 809 P.2d 925, 930 (Alaska Ct.App. 1991); *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226, 231 (1996); *State v. Clark*, 844 S.W.2d 597, 600 (Tenn.1992).

8. This "citizen tip" was even more deficient than the one that failed to establish the lower standard of "reasonable suspicion" in *Graf v. Dep't of Commerce & Regulation*, 508 N.W.2d 1, 3–4 (S.D.1993). There, we held that an anonymous tip which only provided the license number of the vehicle, the general location of the vehicle, and advised that the driver might "possibly" be drunk, did not establish reasonable suspicion.

inquiry is limited to the 'objectively ascertainable question of whether a reasonable well trained officer would have known that the search was illegal despite the magistrate's authorization'") (citing *State v. Klosterman,* 114 Ohio App.3d 327, 683 N.E.2d 100, 103 (1996)).

[¶ 39.] Here, Mundt did not have an objectively reasonable belief that his illegal search on December 14, or his use of that search in the affidavit, was in compliance with the Fourth Amendment. Mundt admitted at the time of the December 14 search that he knew his entry of the chicken coop was illegal and could not be used for a search warrant. Nevertheless, he knowingly included the illegally obtained information in the affidavit. The good faith exception does not apply.

[¶ 40.] Reversed and remanded for further proceedings consistent with this opinion.

[¶ 41.] GILBERTSON, Chief Justice, and SABERS and AMUNDSON, Justices, concur.

[¶ 42.] KONENKAMP, Justice, concurs specially.

KONENKAMP, Justice · (concurring specially).

[¶ 43.] I concur with the Court's opinion. I write specially to identify the structure of the tests to be used and the standards of review to be employed in deciding whether the independent source exception to the exclusionary rule should apply when an illegal search preceded a warranted search. The test has three elements, each of which must be addressed: (1) the warrant affidavit, purged of any information gained through the initial, illegal search, must contain sufficient facts to constitute probable cause for the issuance of the warrant; (2) the decision to seek the warrant must not have been prompted by what was seen during the initial, illegal search; and (3) any information obtained during the illegal search and presented to the issuing judge must not have affected the decision to issue the warrant. *See generally Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *United States v. Restrepo,* 966 F.2d 964, 966 (5th Cir.1992).

[¶ 44.] Although the first element invokes a legal question, our review is ordinarily highly deferential. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). In the usual case, we review challenges to the sufficiency of a warrant by looking at the totality of the circumstances to decide if there was at least a "substantial basis" for the issuing judge's finding of probable cause. *Id.* at 238–39, 103 S.Ct. at 2332 (citations omitted). Our inquiry is whether the information provided to the judge was sufficient for a "common sense" decision that there was a "fair probability" the evidence would be found on the person or at the place to be searched. *Id.* Furthermore, we review the issuing judge's probable cause decision to grant a search warrant independently of the conclusion reached by the suppression hearing court. *State v. Jackson,* 2000 SD 113, ¶ 8, 616 N.W.2d 412, 416 (citations omitted). "[I]n a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *See United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965). However, in a case like this one, involving an illegal prior search, the deferential, substantial basis standard of review is inapplicable when the issuing judge never considered the warrant affidavit purged of the tainted information. *Restrepo,* 966 F.2d at 971 n. 18.

[¶ 45.] The second element—inquiring whether information gained in the illegal search prompted the officers to seek a

warrant—raises a factual question, discerned from the subjective intent of the officers. Motivation must be inferred from the totality of the facts and circumstances. The *Restrepo* decision provides useful guidance for making this determination: "the [trial] court might wish to consider such items as the precise nature of the information acquired during the illegal search ... [and] the relative probative import of this information compared to all other information known to the officers...." 966 F.2d at 972. The question is the "actual motivation or intention of the officers in the particular case," a subjective rather than an objective test. Wayne R. LaFave, 5 Search & Seizure § 11.4(f) at 300 (3d ed.1996).

[¶ 46.] Here, the circuit court did not specifically address the subjective question whether the decision to seek the warrant was *prompted* by what was seen during the initial, illegal entry. *Murray*, 487 U.S. at 542, 108 S.Ct. at 2536 (emphasis added). Were the police so prompted, or not? If the court were convinced that the officers were so prompted, the results of the second, warranted search would be inadmissible. Since the court did not explicitly answer this question, we would ordinarily remand for further findings. *See Restrepo*, 966 F.2d at 972; *U.S. v. Bosse*, 898 F.2d 113, 116 (9thCir.1990) (remanding to determine effect of illegal entry and search on the officers' decision to seek warrant). In a similar case, the North Dakota Supreme Court likewise remanded to the trial court the question of motivation. *See State v. Winkler*, 552 N.W.2d 347, 354 (N.D.1996). As the United States Supreme Court said in *Murray*, "it is the function of the [trial court], rather than the [appeals court], to determine the facts[.]" 487 U.S. at 543, 108 S.Ct. at 2536. In this unique instance, however, the trial court's findings obliquely disposed

of this question, though not the way the trial court intended.

[¶ 47.] On the third element, the question is *not* whether any illegally obtained information *actually* affected the decision of the particular judge who issued the warrant; the question is whether the information presented, with the illegally obtained material excised, was objectively sufficient to establish probable cause. *See Restrepo*, 966 F.2d at 969–70. As the Third Circuit explained in *U.S. v. Herrold*,

the Court's use of "affect" in *Murray* must be understood to signify affect in a substantive manner. Thus, the fact that an application for a warrant contains information obtained through an unlawful entry does not *per force* indicate that the improper information "affected" the [issuing judge's] decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine. Rather, if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.

962 F.2d 1131, 1141–42 (3rd Cir.1992). Thus, in cases where the tainted information is contained in the warrant affidavit, the first and third elements coincide.

[¶ 48.] Lastly, on the question of exigent circumstances, the trial court found that safety concerns about the explosive and toxic dangers of chemicals used to manufacture methamphetamine were not sufficient reasons to justify Sergeant Mundt's decision to open the shed door and look inside. This was a question of law. *State v. Sleep*, 1999 SD 19, ¶ 6, 590 N.W.2d 235, 237. The ruling was not appealed. Nonetheless, it is important to point out for future decisions that safety

factors are a valid consideration in determining whether exigent circumstances exist. *See Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978); *Michigan v. Tyler,* 436 U.S. 499, 509–10, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978). The Eighth Circuit recently emphasized that the "potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had uncovered an on-going methamphetamine manufacturing operation." *United States v. Walsh,* 299 F.3d 729, 734 (8th Cir.2002) (citations omitted).