#28725-r-PJD
**2019 S.D. 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

CURTIS DEAN TENOLD,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

ERIC T. DAVIS
NATHANIEL F. NELSON of
Nelson Law
Sturgis, South Dakota                     Attorney for defendant
                                          and appellant.


JASON R. RAVNSBORG
Attorney General

SARAH L. LARSON
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.

* * * *

ARGUED ON
AUGUST 27, 2019
OPINION FILED **12/18/19**

#28725

DEVANEY, Justice

[¶1.]		A Deadwood police officer initiated a traffic stop of the defendant's vehicle because the officer observed a brake light emit a white light. A consent search of the vehicle did not produce any evidence of unlawful drugs; however, the officer later found a foil ball under the passenger seat of the officer's vehicle where the defendant had been seated. A presumptive test of a substance in the foil ball was positive for methamphetamine, and the defendant was arrested. Thereafter, law enforcement seized evidence from the defendant's hotel room pursuant to a search warrant, and the defendant was indicted for possession and ingestion of an unauthorized controlled substance. The defendant filed a motion to suppress, arguing that the officer did not have reasonable suspicion to stop his vehicle because it had two properly working brake lights. The circuit court denied the motion, and a jury found the defendant guilty on both counts. The defendant appeals. We reverse and remand.

## Factual and Procedural Background

[¶2.]		On February 2, 2017, at 2:35 a.m., Officer Braxton McKeon noticed what he believed to be Curtis Tenold's vehicle leaving the Deadwood Mountain Grand. He decided to follow the vehicle because he had previously received information from Officer James Olson that Tenold and Lana Gravatt were suspected of dealing methamphetamine out of their hotel room at the Deadwood Mountain Grand. Officer McKeon did not immediately initiate a traffic stop because, according to Officer McKeon's later testimony, the claim of

-1-

methamphetamine dealing "had not been substantiated enough" to seek out Tenold and Gravatt on those allegations.

[¶3.] While following Tenold's vehicle, Officer McKeon believed he had reasonable suspicion to initiate a traffic stop when he observed what he later described as "one" taillight "emitting a white light when the brakes were applied." According to Officer McKeon, the brake light in the rear back window of the vehicle emitted white light, while the two taillights on the left and right sides of the vehicle emitted red light. Officer McKeon acknowledged that a vehicle needs only two working brake lights, but he believed that Tenold was committing a traffic violation nonetheless because his third brake light emitted white light.

[¶4.] After stopping the vehicle, Officer McKeon explained to Tenold that he had a broken taillight and would receive a warning ticket for the light. Officer McKeon also asked for and obtained consent from Tenold to search the vehicle. Another officer arrived at the scene, so Officer McKeon had Tenold's passenger, Gravatt, sit in that officer's vehicle during the search. Tenold sat in the front passenger seat of Officer McKeon's patrol vehicle. The search produced no evidence of illegal drug activity. Officer McKeon told Tenold and Gravatt that they were free to leave, and Tenold drove away.

[¶5.] After Officer McKeon returned to the police department, he performed a routine search of his vehicle for items that may have been left by the last occupant. The search revealed a small foil ball under the front passenger seat where Tenold had been sitting during the stop. Officer McKeon believed the ball

contained a white crystalline substance. His field test of the substance produced a presumptive positive result for methamphetamine.

[¶6.] Concluding that the foil ball belonged to Tenold, Officer McKeon located Tenold at a nearby casino and placed him under arrest. He searched Tenold's person and found a small amount of marijuana. Thereafter, Officer McKeon prepared an affidavit in support of a request for a warrant to search Tenold and Gravatt's hotel room. In the affidavit, Officer McKeon included additional information he had obtained from Officer Olson regarding Tenold's and Gravatt's suspected drug activity. Officer McKeon also included information regarding his discovery of the foil ball after the stop and the marijuana found on Tenold's person upon his arrest.

[¶7.] A judge issued the warrant, and a search of the hotel room produced marijuana, drug paraphernalia, and a small amount of methamphetamine. Tenold was indicted by a grand jury and was charged in a superseding indictment with one count of unauthorized possession of a controlled substance or drug and one count of unauthorized ingestion of a controlled substance. Tenold pled not guilty.

[¶8.] Before trial, Tenold filed a motion to suppress. He argued that Officer McKeon did not have reasonable suspicion to initiate a stop of Tenold's vehicle because no law requires that *all* brake lights emit *only* red light upon actuation. He further claimed it was unreasonable for Officer McKeon to believe that the emission of white light from one of Tenold's three brake lights violated any law. Finally, according to Tenold, all evidence obtained after the stop should be suppressed as fruit of the poisonous tree because the evidence was obtained as a result of the stop.

[¶9.]     After two hearings, the circuit court denied Tenold's motion to suppress.  A jury later found Tenold guilty of unauthorized possession of a controlled substance and unauthorized ingestion of a controlled substance.  Tenold appeals, asserting the circuit court erred when it denied his motion to suppress.  He also asks this Court to modify existing law to prohibit pretextual stops as unconstitutional, an issue we need not address because of our disposition on the first issue.

**Analysis and Decision**

*Legality of the Stop*

[¶10.]     Tenold contends the circuit court erred when it interpreted SDCL 32-17-8.1 to mean that *only* red light may display from *all* stop lamps upon actuation.  The plain language of the statute, Tenold claims, does not prohibit the emission of white light from a third brake light when two brake lights meet the display and actuation requirements of SDCL 32-17-8.1.  Therefore, in Tenold's view, Officer McKeon did not have reasonable suspicion to initiate the traffic stop.  We review de novo the issue whether an officer had reasonable suspicion to initiate a traffic stop given the facts and circumstances known to, or observed by, the officer at the time of the stop.  *State v. Lerma*, 2016 S.D. 58, ¶ 6, 884 N.W.2d 749, 751.

[¶11.]     When Tenold was arrested, SDCL 32-17-8.1 provided in relevant part that:

> [E]very motor vehicle, trailer, semitrailer, and pole trailer shall
> be equipped with two or more stop lamps . . . .  The stop lamp
> shall be mounted on the rear of the vehicle at a height of no
> more than seventy inches nor less than fifteen inches.  The stop
> lamp shall display a red light visible from a distance of not less
> than three hundred feet to the rear in normal sunlight, except

for a moped, which distance shall be not less than one hundred fifty feet. The stop lamp shall be actuated upon application of the service (foot) brake which may be incorporated with one or more rear lamps. A violation of this section is a petty offense.[1]

Prior to Tenold's arrest, we specifically construed the language of this statute and held "that all originally equipped brake lights need not display red light and need not be actuated by the brake pedal[.]" *See Lerma*, 2016 S.D. 58, ¶ 10, 884 N.W.2d at 752. In so holding, we concluded that "the most reasonable interpretation is that the Legislature intended the display and actuation requirements to apply only to the two required brake lights." *Id.* ¶ 7, 884 N.W.2d at 751.

[¶12.] Here, the circuit court's decision—that "SDCL 32-17-8.1 requires that all vehicle[] stop lights be red in color only"—directly conflicts with our decision in *Lerma* and is erroneous. It is undisputed that Tenold's vehicle had *two* brake lights that met the display and actuation requirements as stated in SDCL 32-17-8.1. Therefore, the circuit court erred when it concluded that "Officer McKeon had probable cause that a traffic offense had occurred when he activated his red lights and stopped the car."

[¶13.] The State nonetheless contends it was objectively reasonable for Officer McKeon to believe that a brake light displaying white light violated SDCL 32-17-8.1. The State relies in part on the fact *Lerma* acknowledged that the statute was confusing, and thus claims that "SDCL 32-17-8.1 is not definite and certain, but rather unclear and 'open to differing and equally reasonable interpretations[.]'" The

---

1. This statute was amended in 2017, after the stop at issue.

State cites previous judicial interpretations of SDCL 32-17-8.1, as well as our reference to SDCL 32-21-27 in *Lerma* as an alternative basis for the stop.

[¶14.]    "The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or law—must be *objectively* reasonable." *Heien v. North Carolina*, 574 U.S. 54, 66, 135 S. Ct. 530, 539, 190 L. Ed. 2d 475 (2014); *accord Lerma*, 2016 S.D. 58, ¶ 11 n.2, 884 N.W.2d at 752 n.2. In examining the officer's objective reasonableness in *Heien*, the Court considered that North Carolina's appellate courts had yet to construe the confusing law at issue in that case. 574 U.S. at 68, 135 S. Ct. at 540. Similarly, in *State v. Wright*, we noted that "previous judicial interpretations" are a relevant factor in determining the reasonableness of an officer's mistake of law. 2010 S.D. 91, ¶ 16, 791 N.W.2d 791, 797 (quoting *United States v. Martin*, 411 F.3d 998, 1001 (8th Cir. 2005)).[2]

[¶15.]    From our review of the facts here, Officer McKeon's mistake of law was not objectively reasonable for three reasons. First, *Lerma* specifically construed both the display and actuation requirements in SDCL 32-17-8.1 prior to the date of the stop in question, and an objectively reasonable officer would have had actual legal authority dispelling confusion over this statute's interpretation. Indeed, in *Lerma*, we prefaced our holding with a caveat, i.e., that an officer's belief that the

---

2.    In *Wright*, we referenced other factors considered by the Eighth Circuit Court of Appeals, including "drafting history; prior enforcement; police training; previous judicial interpretations; and, state customs." 2010 S.D. 91, ¶ 16, 791 N.W.2d at 797 (citing *Martin*, 411 F.3d at 1001). However, to the extent any of these factors relate to the officer's *subjective* view, a footnote in *Lerma* suggests a consideration of such factors would be improper given the Supreme Court's holding in *Heien* that an officer's subjective understanding is irrelevant. 2016 S.D. 58, ¶ 11 n.2, 884 N.W.2d at 752 n.2.

statute meant *all* stop lamps must comply with the display and actuation requirements was objectively reasonable "*[u]ntil today*[.]" 2016 S.D. 58, ¶ 8, 884 N.W.2d at 751 (emphasis added). Therefore, Officer McKeon was not free to rely on his subjective view of how this law should be interpreted. *See id.* ¶ 9, 884 N.W.2d at 752 ("A reasonably objective officer is bound by such unqualified statements of law.").

[¶16.] Second, decisions from other courts did not provide justification for the stop here. Those decisions, many of which are factually distinguished from the case at hand, predate *Lerma*. *See, e.g.*, *Martin*, 411 F.3d 998; *United States v. Johns*, 410 Fed. Appx. 519 (3d Cir. 2011). As the United States Supreme Court explained in *Heien*, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." 574 U.S. at 67, 135 S. Ct. at 539–40. Moreover, "an objectively reasonable mistake of law cannot be so unmoored from actual legal authority." *United States v. Washington*, 455 F.3d 824, 828 (8th Cir. 2006); *accord Wright*, 2010 S.D. 91, ¶ 17, 791 N.W.2d at 798.

[¶17.] Third, although in *Lerma* we considered SDCL 32-21-27 as an alternative basis for upholding the stop in question, this nonspecific statute makes it unlawful to drive a vehicle on a highway "unless the equipment upon the vehicle is in good working order[.]" SDCL 32-21-27; *see Lerma*, 2016 S.D. 58, ¶ 11, 884 N.W.2d at 753. Unlike the scenario in *Lerma*, SDCL 32-21-27 does not provide an independent basis for the stop here because all the brake lights on Tenold's vehicle were operational. Notably, Officer McKeon's testimony was vague as to the precise condition of Tenold's third brake light. This brake light was on the inside, center of

the back window of Tenold's vehicle, and Officer McKeon could not recall why this brake light emitted a white light. He testified that he did not know if it was broken or whether it was sun damaged. While questioning Officer McKeon at the suppression hearing, the State characterized Tenold's third brake light as a "white light in one of the red lights on the rear of the vehicle." In contrast, in both *Lerma*, 2016 S.D. 58, ¶ 2, 884 N.W.2d at 750 and *State v. Anderson*, 359 N.W.2d 887, 889 (S.D. 1984), the brake lights at issue failed to illuminate upon actuation. Thus, this case is distinguishable from those in which a brake light was not operational.

[¶18.]    Although we conclude that Officer McKeon did not have an objectively reasonable basis to believe that Tenold's brake light violated SDCL 32-17-8.1, our review does not end there. The State further claims we should uphold Officer McKeon's stop based on a review of the totality of the circumstances, arguing that "Officer McKeon undoubtedly knew there was reason to suspect criminal activity when he initiated the traffic stop." In particular, the State offers the following additional information in support of its argument: Officer McKeon was aware that Tenold was suspected of dealing drugs; "Tenold was driving between his hotel and casinos at 2:39 a.m."; and after the stop, drugs were located on Tenold's person and paraphernalia was found in his hotel room.

[¶19.]    "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621 (1981)). "The

stop may not be the product of mere whim, caprice or idle curiosity." *State v. Herren*, 2010 S.D. 101, ¶ 8, 792 N.W.2d 551, 554 (citation omitted).  However, "it is enough that the stop is based upon 'specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *State v. Starkey*, 2011 S.D. 92, ¶ 6, 807 N.W.2d 125, 128 (quoting *State v. Lockstedt*, 2005 S.D. 47, ¶ 17, 695 N.W.2d 718, 722).  To determine whether there existed a particularized and objective basis for believing that criminal activity is afoot, we review the totality of the circumstances at the time the stop was effectuated.  *State v. Stanage*, 2017 S.D. 12, ¶ 7, 893 N.W.2d 522, 525.

[¶20.]		Here, the facts available to Officer McKeon at the time of the stop (minus the mistaken belief that a traffic violation occurred) included: (1) Tenold was suspected of dealing drugs out of his hotel room at the Deadwood Mountain Grand, and (2) Tenold left the hotel parking garage in his vehicle at 2:39 a.m.  We do not, contrary to the State's assertion, consider that drugs were later located on Tenold's person and in his hotel room because these facts were not available to Officer McKeon at the time of the stop.  After reviewing the facts available at the time of the stop in their totality, we conclude that Officer McKeon lacked a particularized and objective basis for believing that Tenold and Gravatt were currently engaging in drug activity.

[¶21.]		First, at the time of the stop, Officer McKeon did not have specific or articulable facts related to Tenold's suspected drug activity.  Rather, based upon our review of his narrative report and suppression hearing testimony, the only information Officer McKeon had at that time was a vehicle description and photos

of Tenold and Gravatt who "were identified as possible dealers of methamphetamine out of rented rooms at the Deadwood Mountain Grand." Moreover, this information came from Officer Olson, and lacked any details about the underlying source of the information. In fact, Officer McKeon explained in his narrative report that Officer Olson had informed the other officers that they should "develop [their] own [r]easonable [s]uspicion for a stop and investigate." Second, the reported drug activity was alleged to have occurred at the hotel, not in Tenold's vehicle. Finally, and most importantly, because there was no timeframe associated with the reported drug activity, Officer McKeon had no information alleging that Tenold or Gravatt were—as they drove from the Deadwood Mountain Grand at 2:39 a.m.—committing a crime. The State's purported basis for reasonable suspicion can thus be summarized as a general suspicion, accompanied by otherwise innocuous behavior.

[¶22.] In *Herren*, we recognized that a tip alleging criminal wrongdoing "can at least be considered as part of the totality of the circumstances" even though the tip may not independently support a stop. 2010 S.D. 101, ¶ 20, 792 N.W.2d at 557. We have also indicated that the time of day or night and the location of the suspected person are relevant factors in determining whether reasonable suspicion exists. *See, e.g., State v. Rademaker*, 2012 S.D. 28, ¶ 13, 813 N.W.2d 174, 177; *State v. Bergee*, 2008 S.D. 67, ¶ 11, 753 N.W.2d 911, 914. Here, however, when Officer McKeon stopped Tenold's vehicle, he had no information alleging that criminal wrongdoing was afoot. Other than observing the vehicle described as belonging to Tenold leave the Deadwood Mountain Grand at 2:39 a.m., Officer McKeon did not

personally observe any additional specific or articulable behavior that would allow him to conclude that a crime was presently occurring or about to occur. Because Officer McKeon did not have reasonable suspicion or probable cause to stop Tenold's vehicle, the stop was unjustified at its inception.

*Exclusionary Rule*

[¶23.] Evidence obtained because of an unlawful seizure ordinarily must be suppressed under the exclusionary rule. *State v. Heney*, 2013 S.D. 77, ¶ 9, 839 N.W.2d 558, 562 (quoting *State v. Boll*, 2002 S.D. 114, ¶ 19, 651 N.W.2d 710, 716). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385, 82 L. Ed. 2d 599 (1984)). However, "the progenitor of the 'fruit of the poisonous tree' doctrine"—*Wong Sun*— "recognized that original lawless conduct would not taint all evidence forever." *Satter v. Solem*, 458 N.W.2d 762, 768 (S.D. 1990). "The question becomes whether 'the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint."'" *Id.* (quoting *United States v. Ceccolini*, 435 U.S. 268, 273–74, 98 S. Ct. 1054, 1059, 55 L. Ed. 2d 268 (1978)).

[¶24.] Tenold, as the party seeking to suppress the evidence, has the burden "to establish that such evidence was illegally seized." *See Heney*, 2013 S.D. 77, ¶ 11, 839 N.W.2d at 562 (citation omitted). Once Tenold "has carried the burden of proving that the challenged evidence is the fruit of the poisonous tree, the burden

again shifts to the government to ultimately 'show that its evidence is untainted.'" *See id.* ¶ 11 n.2 (quoting *Alderman v. United States*, 394 U.S. 165, 183, 89 S. Ct. 961, 972, 22 L. Ed. 2d 176 (1969)).

[¶25.]    Tenold argues that all evidence obtained after the stop—even that obtained pursuant to the search warrant—must be suppressed as fruit of the illegal stop. We agree that the foil ball found in the officer's vehicle after the stop (which at the time had tested positive for methamphetamine) and the marijuana found on Tenold's person were discovered solely because of Officer McKeon's unlawful stop of Tenold's vehicle and his subsequent arrest. Therefore, that evidence was fruit of the illegal stop and subject to the exclusionary rule.

[¶26.]    However, the State contends that Tenold has failed to show that but for the traffic stop, the drugs and paraphernalia in the hotel room would not have been discovered. In the State's view, the information possessed by law enforcement prior to and independent of the traffic stop provided probable cause for the warrant to issue. The State points to the information in the search warrant affidavit derived from Officer Olson relating Tenold's and Gravatt's suspected drug activity at the hotel. In response, Tenold claims that the tip alone was insufficient to establish probable cause.

[¶27.]    "[W]hen a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, '[if] the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted.'" *State v. Habbena*, 372 N.W.2d 450, 455 (S.D. 1985) (second

-12-

alteration in original) (quoting *United States v. Williams*, 633 F.2d 742, 745 (8th Cir. 1980)). "[T]he question is whether 'the remaining information presented to the magistrate, after the tainted evidence is excluded, contains adequate facts from which the magistrate could have concluded that probable cause existed for the issuance of the search warrant.'" *Boll*, 2002 S.D. 114, ¶ 35, 651 N.W.2d at 720 (quoting *State v. Revenaugh*, 992 P.2d 769, 774 (Idaho 1999)).

[¶28.] As Justice Konenkamp recognized in his special concurrence in *Boll*, "[i]n the usual case, we review challenges to the sufficiency of a warrant by looking at the totality of the circumstances to decide if there was at least a 'substantial basis' for the issuing judge's finding of probable cause." *Id.* ¶ 44, 651 N.W.2d at 721 (Konenkamp, J., concurring specially). Here, however, the issuing judge never considered the affidavit free of the tainted information. Nevertheless, because the magistrate judge issued the warrant on a facial review of the information contained within the affidavit, we employ our traditional rules of review to determine whether the information in this hypothetical, redacted affidavit would have been sufficient for an issuing judge to find probable cause for a warrant.

[¶29.] Indeed, even when an affidavit contains no tainted information, our review of "a judge's probable cause determination," is limited to the evidence that "was before the judge at the time the application was made." *State v. Jackson*, 2000 S.D. 113, ¶ 11, 616 N.W.2d 412, 416. This is because the existence of probable cause "must rise or fall on the affidavit itself which was the only evidence presented to the magistrate for his determination of probable cause." *Id.* (quoting *State v.*

*Smith*, 281 N.W.2d 430, 433 (S.D. 1979)). However, "[r]easonable inferences may be drawn from the information in the affidavit." *Id.*

[¶30.]    In *State v. Helland*, we reiterated the standard for determining whether probable cause exists sufficient to support the issuance of a warrant. 2005 S.D. 121, ¶ 16, 707 N.W.2d 262, 269. There must be "a showing of probability of criminal activity." *Id.* (emphasis omitted) (quoting *State v. Kaseman*, 273 N.W.2d 716, 723 (S.D. 1978)). As opposed to evaluating a traffic stop and whether there was *reasonable suspicion* (i.e., something more than a whim or caprice) to warrant further investigation of a crime, the higher probable cause standard must be met when determining the validity of a search of one's property. For a search warrant to issue, the judge must be able "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the judge], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983). And on review, this Court must find that the affidavit provided the judge "with a substantial basis for determining the existence of probable cause[.]" *Id.* at 239, 103 S. Ct. at 2332.

[¶31.]    After excising the tainted information, the remaining pertinent portions of the affidavit contained the following information:

> On January 21, 2017, at approximately 2200 hours, Officer James Olson was contacted by Special Agent Brandon Snyder of the South Dakota Commission on Gaming. Agent Snyder stated that he had some information pertaining to possible drug activity by guests of the Deadwood Mountain Grand.

> Agent Snyder arrived at the Deadwood Police Department and began to tell Officer Olson the information he had received from Mike Gurich, Security Manager of Deadwood Mountain Grand. Agent Snyder provided a list of names compiled by Gurich. Gurich had informed Agent Snyder that at different times throughout the month, rooms had been rented by a Curtis Tenold and Lana Gravatt. When these rooms are rented there is a considerable amount of foot traffic in and out of the rooms at all hours of the night. Gurich had compiled a list of names based off of security footage and players club information. Gurich states these other subjects frequently enter the rooms and leave within a short time frame.

> On January 28, 2017 at approximately 1700 hours, Officer Olson again met with Agent Snyder at the Deadwood Police Department. Agent Snyder stated he met again with Gurich. Gurich informed Agent Snyder that he had received information from other staff stating that Lana Gravatt had approached a customer and asked him if he needed any meth. The Subject reportedly stated no. Gravatt then asked the subject if he had any money she could borrow. The subject again stated no and she replied by saying, "I could do something for you." The subject told the employee about the encounter with Gravatt and that he assumed she was offering sex in exchange for money. The subject reportedly told the employee he was tired of being harassed by Gravatt and Tenold.

> At approximately 1700 hours on 31 January, 2017 Officer Olson provided me with a vehicle description for [Tenold's vehicle]. Officer Olson stated that the occupants of that vehicle were suspected of dealing methamphetamine out of a room at the Deadwood Mountain Grand. Officer Olson stated that I should be on the lookout for that vehicle, and to develop my own reasonable suspicion to stop. Officer Olson stated that Curtis Tenold and Lana Gravatt were the suspected methamphetamine dealers.

[¶32.] The information concerning Tenold's suspected drug activity, as reported by Officer McKeon in the affidavit, is based solely on information given by Gurich to Agent Snyder and then related from Agent Snyder to Officer Olson. Notably, while the affidavit relates what appears to be information derived from a casino customer, it does not identify the customer by name (or as a confidential

informant).  More importantly, the affidavit refers only to thirdhand information reported to an unidentified casino employee, who then passed the information on to Gurich.

[¶33.]     We recognize that Officer Olson provided additional information at the suppression hearing regarding the informants (Gurich and the complaining customer).  But this information was not presented in the search warrant affidavit and was therefore unknown to the issuing judge who had before him only the affidavit prepared by Officer McKeon.  We must likewise confine our review to that information.  *See Helland*, 2005 S.D. 121, ¶ 28, 707 N.W.2d at 272.

[¶34.]     The pertinent information in the affidavit can be condensed into two components:

> 1.     A report from the hotel security manager that there had been frequent foot traffic in and out of the room rented by Gravatt and Tenold at all hours of the night, and that he had compiled a list of names of casino customers frequenting this room by watching security footage; and
>
> 2.     A tip from an unidentified informant about a solicitation of money by Gravatt in exchange for either drugs or possibly sex, along with the informant's general comment about being "harassed" by both Gravatt and Tenold.

"When the affidavit is based substantially on information provided by an informant, evidence of the informant's reliability, veracity, and basis of knowledge is highly relevant to the probable cause determination[.]"  *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004) (citing *Gates*, 462 U.S. at 230, 103 S. Ct. at 2328).  As such, we have recognized two inquiries crucial to a probable cause determination when an informant's tip is involved.  *State v. Raveydts*, 2004 S.D. 134, ¶¶ 11–12, 691 N.W.2d 290, 295.  "First, an 'explicit and detailed description of alleged

wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's] tip to greater weight than might otherwise be the case.'" *Id.* ¶ 11 (quoting *Gates*, 462 U.S. at 234, 103 S. Ct. at 2330). "Second, the extent to which the tip is corroborated by the officer's own investigation is important." *Id.* ¶ 12.

[¶35.] Neither crucial inquiry—when evaluated separately or when combined and considered in totality—supports a finding of probable cause here. First, the affidavit related only that Gurich had observed considerable foot traffic to and from Tenold and Gravatt's hotel room. There was no indication that he observed any unlawful drug activity on the casino security footage. *See, e.g.*, *State v. Ford*, 323 S.E.2d 358, 361 (N.C. Ct. App. 1984) (observing that "[u]nusual traffic at a residence may not, in itself, constitute probable cause to justify the issuance of a warrant authorizing a search of that residence for drugs"). Further, while Gurich compiled a list of names of casino guests frequenting the hotel room, the affidavit does not relate that he or any officer investigated whether any of these persons are known drug users or known to be associated with unlawful drug activity. Moreover, there was no report that any witness actually saw Gravatt or Tenold, or anyone else frequenting their hotel room, with what appeared to be unlawful drugs.

[¶36.] Second, while the affidavit purported to relate a firsthand account of a *solicitation* (as opposed to an actual) drug transaction, this account did not include any detailed information regarding the time, date, and location of the customer's purported encounter with Gravatt, or when the customer's information was initially provided to the unidentified casino employee. Therefore, there was no way to determine the time interval between the alleged solicitation and the request for the

search warrant. Similarly, the affidavit only generally described the informant as a casino "customer" and did not relate any evidence of corroboration of this unidentified customer's claims or any other basis upon which the customer's veracity or reliability could be assessed. In essence, the affidavit merely relates a tip of "possible drug activity" (aptly described by the officer in the first paragraph of the affidavit) communicated through three other parties (casino employee to Gurich to Agent Snyder) before being provided to law enforcement.[3]

[¶37.]        In contrast to the affidavit here, the affidavit we upheld in *Raveydts*, provided considerably more detail related to the anonymous tips. *See* 2004 S.D. 134, ¶ 10, 691 N.W.2d at 294. In *Raveydts*, the first informant related that he resided in the same apartment building as the defendant, and in addition to a general description of frequent traffic in and out of the defendant's apartment, the informant gave a physical description of a particular visitor who left the apartment "with something small and plastic clutched in her hand." *Id.* This informant also provided a list of license plate numbers he had observed in the last few days at the apartment, and the investigating officer verified that some of these license plate numbers belonged to persons arrested for possession of marijuana or were identified in debriefs with law enforcement as persons known to have been involved in illegal

---

3.    *Contra United States v. Salsberry*, 771 Fed. Appx. 710, 710–11 (8th Cir. 2019) (affidavit indicated hotel room was rented by a known drug user, informant twice told officer that defendant was selling drugs in the area, and hotel staff had discovered items related to the use and distribution of drugs); *United States v. Good*, No. 8:18CR49, 2018 WL 3543910, at *1–3 (D. Neb. June 29, 2018) (affidavit indicated informant told officer within 72 hours that informant had observed defendant in possession of a firearm, cash, and drugs at a specific location; and the officer related his familiarity with the informant in the affidavit).

drug trafficking activity. *Id.*; *accord State v. Gilmore*, 2009 S.D. 11, ¶ 15, 762 N.W.2d 637, 643 (finding sufficient corroboration where law enforcement corroborated a confidential informant's tip by verifying that the individuals with whom Gilmore was previously and currently associating were known to be drug users or distributors).

[¶38.] The second anonymous informant in *Raveydts* relayed personal experience with illicit drugs and reported that the odor of marijuana could be detected from the defendant's apartment. The informant also reported a transaction on a specific date where a male known to the informant as a drug dealer arrived at the apartment, after which several vehicles arrived and left shortly thereafter. *Raveydts*, 2004 S.D. 134, ¶ 10, 691 N.W.2d at 294.

[¶39.] Notably, in *Raveydts*, we looked to *People v. Titus*, 880 P.2d 148, 151–52 (Colo. 1994), as an example of a scenario in which an anonymous informant's information was *insufficiently* corroborated to support a finding of probable cause. 2004 S.D. 134, ¶ 13, 691 N.W.2d at 295. The informant in *Titus* had provided a list of license plate numbers of alleged drug buyers who frequented a suspect's home. *Titus*, 880 P.2d at 151. The police in *Titus* corroborated only the fact that the license plate numbers on the list matched the description of the vehicles given by the informant. *Id.* This was insufficient, the court explained, because "there must be something more than the mere fact that people are coming and going in order to support the belief that criminal activity is occurring." *Id.*

[¶40.] Similarly, here, Gurich only provided information relating that he observed individuals frequent Tenold and Gravatt's hotel room and that he

identified those individuals from "players club information." Officer McKeon's affidavit did not relate any investigative attempts to corroborate the suggestion that the individuals on the list were engaging in drug transactions. Notably, Officer Olson candidly admitted at the suppression hearing that he did not "progress any further in [his] investigation of it" because he "had a lot to confirm of what [the informant] was saying." As we noted in *Raveydts*, "[a]bsent any additional corroboration—for example, that the owners of the vehicles were involved in *illegal activity*—[the affidavit] was insufficient to support a finding of probable cause." 2004 S.D. 134, ¶ 13, 691 N.W.2d at 295 (quoting *Titus*, 880 P.2d at 152).

[¶41.] Because the hypothetical, redacted affidavit in this case lacks sufficient independent corroboration of the purported statements by the unidentified casino customer, there would be no way for an issuing judge to evaluate the reliability or veracity of this thirdhand information. The redacted affidavit thus fails to make the requisite showing of probability that evidence of unlawful drug activity would be found in Tenold's hotel room. Upholding the warrant would condone, contrary to *Gates*, the issuance of a warrant on "a mere ratification of the bare conclusions of others." *See* 462 U.S. at 239, 103 S. Ct. at 2333. Once the information derived from the unlawful traffic stop is excluded from the search warrant affidavit, it lacks a substantial basis upon which probable cause could be found. Therefore, the exclusionary rule applies here, and the evidence seized pursuant to the search warrant must be suppressed.

[¶42.] Reversed and remanded.

#28725

[¶43.]     GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER,

Justices, concur.